**ZEHR et al. v. WARDALL et al.**
No. 9228.

Circuit Court of Appeals, Sixth Circuit.

April 6, 1943.

Gustavus Ohlinger, of Toledo, Ohio (Beckwith, Ohlinger, Koles & Wolf and Gustavus Ohlinger, all of Toledo, Ohio, on the brief), for appellants.

Arnold F. Bunge, of Toledo, Ohio (Marshall, Melhorn, Davies, Wall & Bloch, Donald F. Melhorn, and Arnold F. Bunge, all of Toledo, Ohio, on the brief), for appellee.

Before SIMONS, HAMILTON, and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

In an action brought by appellants, for damages arising out of an alleged breach of contract, the trial court directed a verdict in favor of appellee, and appellants claim error. The suit grew out of a telegraphic order for certain merchandise and the claimed acceptance of the order, or counter-offer, as set forth in a letter signed by appellee.

Counsel for appellants contend that the entire contract between the parties consisted of appellants' telegram and appellee's letter. The telegram, dated April 27, 1939, addressed to appellee, reads as follows: "Book 2 Minimum Cars USP at $15.00 New York One Car Delivery Pettisville November Fifteenth Other December Thirtieth Sealed Drums."

Appellee's response, of the same date, acknowledged receipt of the telegram and stated that appellee, in accordance therewith, confirmed "having entered your order as follows:

"2 cars, each 130 x 30 gallon drums— Pure British Poultry USP XI Cod Liver Oil Non-destearinated 'Solvitax' Brand guaranteed a minimum of 1000A and 100D AOAC Chick Units Per Gram—at * * * $15.00 per 30 gallon drum, fob New York—

"Delivery: 1 car for delivery in Pettisville, Ohio on November 15, 1939, 1 car for delivery in Pettisville, Ohio on December 31, 1939.

"Terms: Net sight draft.

"This business is appreciated and we thank you kindly for it."

It is insisted by appellants that inasmuch as the above communications constituted the contract, no other correspondence between the parties is admissible to change or alter the terms thereof; and that by reason of default in shipment of the merchandise, appellee is liable for damages.

Appellants' telegram does not mention the merchandise which it alleges it ordered, and is incomplete as to terms of shipment and payment. A mere acceptance of this order would not, in itself, support an action for damages. But it is contended that appellee's letter was a counter-offer, specifying the complete terms of the transaction; and that inasmuch as appellants did not repudiate the acceptance of the offer as evidenced by the letter, their silence was an implied acceptance of the counter-offer. It is unnecessary to discuss this proposition, or similar contentions arising out of subsequent dealings of the parties, as the case involves other controlling principles of law.

Previous to the dispatch of the telegram by the appellants, the parties had engaged in a correspondence with reference to the subject matter of the alleged contract.

On March 1, 1939, appellee had written, mentioning certain prior conversations between the parties, and stating that "we are pleased to quote:

"British Poultry Non-Destearinated Cod Liver Oil USP XI 1000 A and 100 A O A C Units per Gram, carload lots in 30 gallon drums @ $15.75 per drum, C.I.F. New York.

"The Destearinated Oil, same potency, costs $3.00 per drum more or $18.75 per drum, C.I.F. New York.

"This oil complies strictly with all the U.S.P. requirements, in fact, for most specifications of the U.S.P., British Oil is superior to the requirements. Each drum, in fact each gallon is the same and identical with the drums out of the same batch drawn from tanks of 500 ton capacity. This material is guaranteed to conform and pass all U.S.A. Government regulations.

"Terms: Sight Draft, Bill-of-Lading attached and we will protect on bonafide shipping dates until September 30th, 1939."

A few days later, on March 4, 1939, appellee again wrote appellants as follows:

"We are pleased to advise you that we have been appointed exclusive United States agents for the British Cod Liver Oil Producers (Hull), Ltd. St. Andrew's Dock, Hull, England and we are taking the liberty of sending you a type sample of Pure British Medicinal Nonfreezing Cod Liver Oil 'SOL-VIT-AX' Brand.

"This oil is fully B.P. and U.S.P., and has a guaranteed Vitamin Potency of 1000A and 100D International Units per gram."

The letter went on to describe the character of the oil referred to, and its freedom from taste and odor. It described the experience of the British Cod Liver Oil Producers, Ltd., its methods of production, the vitamin content of the cod liver oil, the extent of the fisheries, the comparison of the vitamin values as compared to the United States Pharmacopeia, and other similar information.

On March 13, 1939, appellants replied to appellee's letter of March 4th, asking quotations on certain lots of the English oil, outlining the type of drums which appellants desired, and requesting appellee's best proposition on the stated amounts as soon as possible.

In reply, appellee quoted prices on Nondestearinated British Cod Liver Oil at $15 per drum, f. o. b. New York, and the same type, Destearinated Oil, at $18 per drum, f.o.b. New York, and mentioned that the terms of payment were "sight draft documents attached."

Again, on March 20, 1939, appellee wrote that there had been a slight decline in price and that "Pure British Poultry U.S.P. Nondestearinated Oil" was then priced at $15 per drum, and that the Destearinated Oil was priced at $18 per drum.

To this last letter, appellants replied on April 1, 1939, that they had considered the British cod liver oil and would be willing to try a truck load of 50 or 60 drums, if they could secure "an interesting price" on such an amount. Appellants further requested advice on what appellee could do on such an order "either f.o.b. Cleveland, O., or delivered Pettisville, O."

Appellee answered that "in less than carload quantities" the Non-Destearinated Oil would cost $18 per drum, f.o.b. New York, and the Destearinated Oil $21 per drum.

Three weeks after the date of this letter from appellee, on April 27th, appellants sent the telegram reading: "Book 2 Minimum Cars USP at $15.00 New York One Car Delivery Pettisville November Fifteenth Other December Thirtieth Sealed Drums."

Obviously, this telegram referred to appellee's quotations in its letters of March 15th and March 20th, as those letters referred to "Pure British Cod Liver Oil USP Nondesteardinated * * * 'SOL-VIT-AX' Brand" cod liver oil—priced at $15 per drum—and appellee's letter replying to the telegram in entering the order, specified the merchandise to be "Pure British Poultry USP XI Cod Liver Oil Nondestearinated 'Solvitax' Brand," at $15 per 30 gallon drum, f.o.b. New York, net sight draft.

Because of a state of war, the British Cod Liver Oil Producers, Ltd., was unable to supply cod liver oil, and appellee was unable to fill appellants' order. Whereupon, suit was brought for breach of contract.

The trial court held, adversely to appellants, that there was no meeting of the minds between the parties and that, consequently, an action on contract would not lie; and were we to accept appellants' contention that the telegram and letter, dated April 27, 1939, constituted the entire contract, we would be inclined to agree with the trial court.

■ However, where a contract is made by correspondence, the accepted rule is that the intent of the parties must be gathered from the whole of the correspondence; and in determining whether there was a meeting of the minds of the parties, all parts of the correspondence and their relation to, and bearing upon each other, must be considered. In establishing the terms of the contract, it would obviously be to appellants' advantage to rely upon the whole of the correspondence between the parties; and from the entire correspondence, it must be concluded that the terms of the contract were certain, complete, and enforceable. In fact, it is the entire correspondence that gives sense to the agreement of the parties and discloses their intention, which otherwise would be confused and uncertain.

■ Appellants insist, however, that any letters or communications other than appellants' telegram of April 27th and appellee's letter of the same date, are inadmissible, as

altering the terms of the contract thereby made between the parties. We conclude, however, that all of the correspondence having to do with the subject matter was properly admissible, for it does not change or alter the agreement of the parties, but rather explains the transaction.

That appellants, who have everything to gain—in this regard—by a consideration of all such correspondence, should be most insistent on its exclusion from the evidence—except for the telegram and appellee's letter of April 27th—might seem, on the surface, inexplicable. But the explanation is to be found in the fact that, in such correspondence, is to be found evidence that defeats appellants' action because it discloses that appellee acted in the transaction as an agent rather than as a principal; and it was upon this ground, as well as others, that the trial court directed a verdict in favor of appellee.

As has been mentioned, in its letter of March 4, 1939, to appellants, appellee stated:

"We are pleased to advise you that we have been appointed exclusive United States agents for the British Cod Liver Oil Producers (Hull), Ltd., St. Andrew's Dock, Hull, England and we are taking the liberty of sending you a type sample of Pure British Medicinal Nonfreezing Cod Liver Oil 'SOL-VIT-AX' Brand. " * * *"

On March 13, 1939, appellants wrote: "I have at hand your letter of March 4th in which you state that you now have a connection with English Oil producers namely Hull Ltd. whereby you can obtain very high quality Cod Liver Oil. * * *"

On March 15, 1939, appellee stated:

"We acknowledge with thanks receipt of your letter of March 13th which is in reference to Pure British Cod Liver Oil USP Nondestearinated and also Destearinated—'SOL-VIT-AX' Brand.

"We are the exclusive agents for the British Cod Liver Oil Producers Ltd., Hull, England.

"We are in a position to quote on two grades of Poultry Cod Liver Oil—both packed in thirty American Gallon drums equipped with faucets—* * *"

On March 20, 1939, appellee wrote: "Since quoting you on British Cod Liver Oil, find that there has been a slight decline in price and their price at the present moment, and which I believe is bottom, is

Pure British Poultry USP Non-Destearinated Oil containing 1000 Units A and 100 D, A.O.A.C. Chick Units per gram @ $15.-00 per drum instead of $15.75—f.o.b. New York. * * *"

On March 29, 1939, the British Cod Liver Oil Producers, Ltd., stated in a letter to appellants, the following:

"Our Agents in the United States—McKesson & Robbins, Inc.,—have told us of your interest in Cod Liver Oil. We are therefore enclosing a booklet which will give you a little pictorial evidence of our activities. * * *

"We hope to have the pleasure of supplying your requirements of Cod Liver Oil through the intermediary of Messrs. McKesson & Robbins, Inc."

The effect of the above statements was that appellee disclosed not only that it was the agent in the sale of the British cod liver oil in question, but that the British company was its principal; and this was further emphasized by a letter to appellants from the British company itself. In addition, appellants had knowledge that the oil mentioned in appellee's letter of April 27, 1939, was the oil produced by the British company, and that appellee was the only concern in this country that represented the British company in its sale. It is argued, however, that the word "agent" may have a multitude of meanings, and is frequently used between a party who manufactures a product, and the party to whom he sells the product for distribution; and that, therefore, the question whether appellee contracted as an agent was one of fact for the jury. Of course, the term may be used to describe a relation of sale, just as "agency" may be used with reference to a place of business, or a relation other than that of representing a principal. But in the usual and ordinary meaning, an agent is one who acts for or in place of another by authority from him. The term agent presupposes a principal. In Haluka v. Baker, 66 Ohio App. 308, 34 N.E.2d 68, the Court of Appeals of Ohio quoted from Restatement of the Law of Agency, Chapter 1, Topic 1, Sec. 1. (1), as follows: "Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." In the same section it is stated: "(2) The one for whom action is to be taken is the principal. (3) The one who is to act is

the agent." Since there is nothing in this case to indicate the intent to employ the term "agent" differently, it is to be taken in its usual sense, in accordance with the rule that in construing a written contract, the words employed will be given their ordinary meaning, in the absence of anything to show that they were used in a different sense. Using the term in question in its ordinary sense, it must be assumed that appellee was acting, not for itself in the transaction, but as agent for the British company, its principal. Furthermore, an examination of the correspondence does not indicate that there was any other evidence from which the court, or the jury, could draw inferences that appellee was not acting as agent, merely because appellee, in its letters, used such language as "We are pleased to quote British Cod Liver Oil * * * as follows" and "We * * * confirm having entered your order. * * *" "One who purports to contract on behalf of a designated person does not manifest by this that he is making a contract on his own account, and only where he so manifests does the agent become a party to the transaction which he makes. In the absence of other facts, the inference is that the parties have agreed that the principal is and the agent is not a party. This is true, although the agent uses such an expression as, 'I will sell.'" See Restatement, Agency. Sec. 320, Comment a.

But it is contended that where an agent executes a contract in his own name, he is personally bound. While this is the general rule with regard to formal contracts, including deeds, instruments under seal, and promissory notes, yet where the parties are negotiating informally, such rule is not controlling. See Mechem on Agency, Sec. 1408. This would be especially so where the informality of a contract is characterized by letters and other correspondence. It cannot be concluded that appellee was personally bound because in a letter replying to appellants' telegram, it did not sign as an agent, in view of the fact that three previous letters had informed appellants that appellee was the agent for the British company.

When the motion to direct a verdict was made, the trial court had before it correspondence setting forth that appellee was the agent of the British company; that such company had further informed appellants that appellee was its agent; and that the only way in which appellants could secure the British oil was through appellee. There was no other evidence, either in the correspondence or aliunde, that the agreement was entered into by appellee other than as agent. Where the entire contract is found in correspondence between the parties, the court should construe it; and where the determination of a case depends upon the construction of written correspondence and there is no other evidence from which different inferences can be drawn, it is the duty of the court on motion to direct the verdict. See Sea Ins. Co. of Liverpool, England v. Johnston, 5 Cir., 105 F. 286. On the ground that appellee was not personally liable on the contract, the trial court properly directed a verdict.

The judgment is affirmed.