**HOUSTON–STARR COMPANY,**
Plaintiff,

v.

**BEREA BRICK & TILE COMPANY,**
Defendant.

No. 35835.

United States District Court
N. D. Ohio, E. D.
June 23, 1961.

George I. Meisel, Squire, Sanders & Dempsey, Cleveland, Ohio, Philip Huss, Jr., Lewis & Drew, Pittsburgh, Pa., for plaintiff.

David L. Daley, Stith, Daley & Butler, Elyria, Ohio, for defendant.

McNAMEE, District Judge.

This is a diversity action, the plaintiff being a corporate citizen of Pennsylvania and the defendant a corporate citizen of Ohio. Plaintiff is now and for 55 years has been engaged in the sale of builders' supplies including bricks. Twice during its business life plaintiff has been a manufacturer of bricks. Defendant is and has been a manufacturer of bricks for about 5 years. Plaintiff claims that commencing in June, 1958 and continuing through the fall of that year it placed orders with defendant for brick to be used by building contractors in the Pittsburgh, Pa., area in the exterior construction of homes. Plaintiff alleges that said orders were placed in reliance upon defendant's express warranty that the bricks would "withstand the weather." Plaintiff claims also that defendant knew the purpose for which such bricks were to be used and that plaintiff relied upon defendant's skill and judgment to furnish bricks reasonably fit for such purpose. Plaintiff alleges further that after the bricks were incorporated into the exterior walls of completed homes they crumbled, spawled and deteriorated generally so as to require replacement; that plaintiff was obligated to and did bear the expense of removing and replacing deteriorated brick in approximately 25 completed dwellings and that plaintiff is obligated to assume the additional expense of further replacements to be made in the future, all to its damage in the sum of $40,-000. Defendant denies that it expressly warranted that bricks purchased by plaintiff would withstand the weather and denies that plaintiff relied upon defendant's skill or judgment to furnish brick fit for the purpose for which plaintiff intended to use them. Defendant avers that plaintiff purchased bricks known in the trade as "culls" and that said cull bricks were of known inferior quality and sold to plaintiff at a substantially reduced price. Defendant denies that plaintiff was damaged as alleged. Defendant also asserts a counterclaim in the sum of $1,056 for the unpaid purchase price of Grade A–1 bricks ordered and received by plaintiff in April 1959. The issues are: (a) Did defendant expressly warrant that cull bricks sold to plaintiff would withstand weather; (b) Under the facts of this case, was there an implied warranty that cull bricks were reasonably fit for the purpose for which plaintiff intended to use them; (c) Is defendant entitled to recover on its counterclaim.

### Facts

In the late spring of 1958 Donald Mackall, who prior to that time had been associated with other manufacturers of bricks, was hired by defendant as superintendent of its plant at Berea, Ohio. On May 14, 1958 Mackall wrote plaintiff, who had been a customer of his during the time he represented a manufacturer of bricks with a plant located at Darlington, Pa. In that letter Mackall alluded to his satisfactory dealings with plaintiff in former years and forwarded samples of brick to plaintiff. The concluding sentence of the letter reads: "How about helping out a new man at a new job, by sending in some orders." The letter was signed "Berea Brick Co., D. A. Mackall, Supt." Shortly after the receipt of the above letter representatives of plaintiff visited the plant of defendant at Berea, Ohio and inspected bricks manufactured by the latter. At that time and at intervals thereafter in conformity with its wishes samples of brick were delivered to plaintiff. On June 5, 1958 plaintiff wrote defendant "Attention Mr. 'Red' Mackall." The second paragraph of that letter read:

"When I spoke to you on the phone you said you had some $20.00 brick which were, I believe, seconds. Some

of the builders are using a very cheap brick here, but of course they would have to be burned hard enough to stand up. Would it be possible for you to send us one box of the $20.00 brick, which I imagine would come in a mingled shade?"

On June 13, 1958 Mackall wrote plaintiff on stationery bearing the following letterhead:

The Berea Brick & Tile Company
9485 Eastland Road
Berea, Ohio

The letter contained the following statement:

*"We have 50000 hard cull brick here in the yard, I will personally guarantee them to withstand the weather, you can have them for $20.-00 per M.* Things are certainly dead around here, and I would certainly appreciate any business you can throw my way. (Emphasis supplied.)

The letter was signed:

"D. H. Mackall
Berea Brick & Tile Co.

"P. S. I mailed you a sample of our cull brick today."

■ It is plaintiff's claim that the above italicized language constitutes an express warranty of cull brick by defendant. Commencing on June 11, 1958 and continuing at intervals thereafter until October of that year plaintiff placed orders with defendant which, with but few exceptions, were for cull bricks at the cheaper price of $20 per M, which was 33⅓% less than the price of A–1 brick. The total quantity of cull bricks purchased by plaintiff from defendant was between 350,000 and 400,000. Defendant's delivery receipts accompanying each shipment described the bricks as "culls." The bricks were delivered to designated customers of plaintiff at the "job sites" by a trucking company selected by plaintiff. Plaintiff also purchased a quantity of cull bricks that had been lying in a pile in defendant's yard since 1956 for $15 per M. These bricks were old and dirty and as a result of long exposure to the weather they were defective in other respects. Plaintiff asserts no warranty as to such bricks. Plaintiff also purchased a relatively small quantity of defendant's Grade A–1 brick but there is no evidence of damage resulting from the use of such brick. A few of the 30 or more orders for $20 cull brick bore various notations of plaintiff such as "new customer fair quality" (Order No. 5733). On Order No. 5833 there appears the following: "Red, would like for brick not to (sic) soft a little mingled in red." Order No. 5824 bore the following typed notation: "Red, please watch these brick as our customer is vary particular." In the handwriting of plaintiff's representative there also appears on Purchase Order No. 5927 the notation: "Must be good not to (sic) soft." Prior to June 1958 plaintiff had purchased cull brick from other sources which it sold to contractors for use in the exterior walls of homes. It was not shown that any warranty was given by the manufacturers of such brick. Among those from whom plaintiff purchased cull brick was The Ohio Lumber & Face Brick Company. The invoices of that company for cull brick sold to plaintiff bore the legend "Not recommended for exterior use." Despite this implicit warning, plaintiff sold and delivered such brick to contractors at the "job sites" for use in the exterior construction of homes. On November 5, 1958 plaintiff wrote The Ohio Lumber & Face Brick Company requesting price lists on that company's various grades of brick manufactured at its plant at Strasburg, Ohio. The letter contained the following:

"If you would like to clean up your culls and B Grade brick I believe we could help you do this provided the price is sufficiently low."

Correspondence in evidence discloses also that in 1958 plaintiff purchased cull brick from Greenfield Industries, Inc., and on one occasion attempted to secure a reduction of $24 on a small order of such brick. In a letter dated August 2, 1958 the Credit Manager of Greenfield Industries dis-

allowed the reduction and, among other things, said:

"* * * Cull brick has no guarantee. When you purchase cull brick that is what you will receive. Brick not usable for any purpose but for back-up etc."

As defined by witnesses of long experience in the brick industry, a cull brick is one that is inferior or defective in one or more of the following respects: Overburned, underburned, twisted, oversized, badly shaped, cracked, structurally unsound. One witness characterized cull bricks as "the cats and dogs of the brick industry." It was shown that cull bricks are used customarily for "back-up work" or "hidden work"—inside fireplaces, etc. It was established that it is not the custom in the brick industry to warrant cull bricks. Mackall had no express authority to warrant that cull bricks would withstand the weather. The officers of defendant had no knowledge that Mackall had made such a warranty until sometime in 1959 when plaintiff first discussed its claim for damages with Gerald Rushlow, president of defendant, who was "astounded" to learn of Mackall's guarantee. In January 1959 Mackall was discharged from defendant's service for reasons not related to the subject matter of this litigation. Plaintiff submitted proof of substantial damage in bearing the expense of re-bricking the many homes in which cull brick were used and there is evidence tending to show that plaintiff will be required to bear additional expense of like character in the future. Further facts will appear in the discussion of the issues.

## Discussion

■■ Did Mackall have implied authority as defendant's agent to expressly warrant cull brick? As indicated above, it was shown that it is not the custom in the brick industry to warrant cull brick. Plaintiff with its long years of experience knew this, as did Mackall, who testified that it was not customary to guarantee cull brick. Defendant conferred no express authority upon Mackall

to warrant cull brick and, as shown, was never informed by the latter that he had given such a warranty. The principle that governs in this factual context is stated in 2 Am.Jur., Agency, § 132, p 106, as follows:

"The rule advanced by a majority of the decisions as well as by the American Law Institute, is, in substance, that the authority to sell a particular article includes the authority to warrant the title, quality or condition of the thing sold if, and only if, such warranty is usual or customary in such a transaction, and is reasonably necessary to transact the business intrusted to the agent."

To the same effect is 2 C.J.S. Agency § 115, p. 1334; § 63, Restatement of the Law of Agency, 2d, p. 171. See also 2 Ohio Jur.2d, Agency, § 68, p. 119. Plaintiff concedes the foregoing principle to be an established limitation upon the implied authority of an ordinary selling agent but contends that Mackall was the managing agent of defendant and as such had implied authority to bind the defendant by an express warranty of quality of cull brick contrary to the custom of the brick industry. Mackall was not the highest official of defendant corporation. He held himself out to the plaintiff as the superintendent in charge of defendant's plant. A plant superintendent is seldom regarded as the chief officer in the corporate chain of command. In his own words, Mackall was "a new man on a new job," who needed help by way of orders for brick. That he had no illusions about the extent of his authority to bind the defendant is evident from Mackall's personal guarantee that cull brick would withstand the weather. The terms of the guarantee alone were sufficient to put plaintiff on inquiry as to the extent of Mackall's authority. Plaintiff made no such inquiry but now attempts to elevate Mackall to an official corporate status never enjoyed by him during his short tenure as a supervisory employee of defendant. That Mackall had general authority to sell brick may be conceded but the scope of his implied authority

was not dependent upon whether he was a general or special agent but upon the usages and customs of the business in which he was employed. As stated in 2 Am.Jur., Agency, § 132, p. 107:

"Accordingly, in most cases the implied power of the agent to warrant is not made dependent upon whether he is a general or special agent, but upon usages and customs of business. The correct principle, briefly stated, is that an agent under an employment to make sales is impliedly authorized to employ only those means for the purpose usual to the business, and that the buyer cannot safely assume that he has authority to make any extraordinary guaranty or warranty, or one beyond the usage of the business in which the agent is employed."

The rule is announced in 2 C.J.S. Agency § 115, p. 1335, as follows:

"More accurately, either general or special agents to sell are impliedly authorized to warrant the goods sold in so far as the warranties given are incidental to the performance of their mandates as being usual or reasonably necessary to the exercise of the power to sell * * * If no custom to warrant is established, there is no implication of authority to do so from an appointment as selling agent."

See also 2 C.J.S. Agency § 99, p. 1229; § 63 of Restatement of Agency, 2d, p. 171.

In support of its contention as to the allegedly broad powers of Mackall, as agent, plaintiff cites and relies upon the Ohio cases of Miller v. Wick Bldg. Co., 154 Ohio St. 93, 93 N.E.2d 467; Oil Well Supply Co. v. Davidson, 1905, 18 Ohio Cir. Dec. 731, 8 Ohio Cir.Ct.R.,N.S., 417 and Dayton v. Hooglund, 39 Ohio St. 671, and upon many cases from other jurisdictions. All of the cited cases are distinguishable. In none of them was there a warranted product of known inferior quality nor did any of the buyers in the cited cases have the experience and knowledge of the products and custom of the business possessed by the plaintiff in the case at bar. Moreover, in none of the cited cases was there a question raised that the warranty was the personal obligation of the agent rather than a promise made by him in his representative capacity. As shown above, the warranty upon which plaintiff relies reads: "I will personally guarantee them to withstand the weather, you can have them for $20 per M." It seems indisputable that the above language unambiguously expresses the personal guarantee or warranty of Mackall. Plaintiff, however, vigorously opposes such construction and contends that when read in the context of the entire letter, including the printed stationery bearing the letterhead "Berea Brick & Tile Co." and the signature of Mackall as it appears in juxtaposition to the typed name of defendant, the warranty must be construed as the act of Mackall in his representative capacity. Plaintiff cites and relies on Section 155 of the Restatement of Agency, 2d, which reads:

"In the absence of manifestations to the contrary therein, an unsealed written instrument is interpreted as the instrument of the principal and not of the agent if, from a consideration of it as a whole, it appears that the agent is acting as agent for a principal whose name appears therein as such."

Comment a. reads, in part:

"If the integration of a contract is contained in a single document, the entire document, including the heading, body, and signature, is considered; * * *. No part of a document is necessarily more important than any other part for the purpose of determining the parties thereto."

See 2 Am.Jur., Agency, § 240, p. 193.

An examination of the letter of June 13th in its entirety, including the words of warranty in the body thereof, seems clearly to compel the rejection of plaintiff's contention. Plaintiff cites and re-

lies upon cases holding that agents using such expressions as "I will sell"—"I promise" or "We bind ourselves" were acting in representative capacities. Zehr v. Wardall, 6 Cir., 134 F.2d 805; In re Serapis, D.C.1889, 37 F. 436. In the latter case it was stated expressly that the obligation was made in the master's "representative capacity." At page 440. Plaintiff cites no case in which the body of the instrument contains the words "I will personally guarantee." It is a fair inference from the language of the warranty that Mackall was aware of his lack of authority to bind his principal by a warranty of cull brick. Otherwise it is not likely that he would have given his own personal guarantee that the cull brick then in the yard would withstand the weather. If words are to be given their ordinary and usual meaning, it must be held that by the use of the phrase "I will personally guarantee" Mackall was speaking in his individual capacity rather than as a representative of defendant. Indeed, unless the word "personally" is rendered devoid of meaning, the foregoing construction is inescapable. Plaintiff contends that defendant alone would benefit by the sale of its brick and that in making the warranty Mackall served no purpose of his own. This argument by-passes the obvious fact that it was distinctly in Mackall's interest as "a new man at a new job" to obtain as many orders for brick as he could and thus strengthen his position with his new employer and perhaps increase his remuneration. Mackall is not a party to this action and the scope of his personal warranty is not an issue. I consider it not inappropriate, however, to say that whether Mackall's guarantee be considered binding upon defendant or not, the scope of his warranty does not extend beyond the 50,000 cull brick in defendant's yard on June 13, 1958. Diligent search of the authorities has disclosed but one case directly in point. That case holds contrary to plaintiff's contention here. London Guarantee & Accident Co. v. J. J. Newman Lumber Co., 116 Miss. 534, 77 So. 522, 524, L.R.A.1918C 310. In that case Louis V. Clark & Co., agents of the London Guarantee & Accident Co., Ltd., of London, England, wrote a letter to a policyholder of the insurer that contained the following: "In this connection we wish to confirm the verbal agreement that our office *personally guarantees* that the rate your company will have to pay shall not exceed 2% total, etc." (Emphasis supplied.) The letter was written on stationery bearing the letterhead "London Guarantee & Accident Company, Limited of London, England" and was signed "Louis V. Clark & Co., Mgrs. So. Dept." In an action by the plaintiff against the policyholder to recover premiums, the court held that the guarantee contained in the letter from Louis V. Clark & Co. to defendant was the personal guarantee of the agent "for the body of the letter, and not the form of the signature thereto, must control." Compare: Robinson v. Kanawha Valley Bank, 44 Ohio St. 441, 8 N.E. 583.

For the reasons stated above it is held that plaintiff has not sustained the burden of showing that Mackall as defendant's agent had authority to expressly warrant the quality of the cull bricks nor has plaintiff shown that Mackall as agent of defendant gave such a warranty.

### Was there an implied warranty of fitness?

Section 1315.16, Ohio Rev. Code, provides, in pertinent part:

"(A) When the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he is the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose. * * *

"(C) If the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed."

To recover on an implied warranty plaintiff must show by a fair preponder-

ance of the evidence that defendant knew that the cull brick sold to plaintiff would be re-sold for use in the exterior of homes and that plaintiff justifiably relied upon defendant's skill or judgment that the cull brick was fit for such purpose. There is no doubt that defendant knew that plaintiff intended to sell the cull bricks to contractors for use by the latter in the exterior construction of homes. Mackall testified he had such knowledge and circumstances shown by the evidence tend to confirm his testimony in this regard. Proof that the buyer justifiably relied on seller's skill or judgment is of paramount importance in establishing the requisite statutory elements of an implied warranty. In this connection, Professor Williston says:

> "Mere knowledge on the part of the seller that the buyer intends to make a particular use of the goods does not necessarily establish a warranty that the goods are adapted to such use. Under the Sales Act the buyer's justifiable reliance on the seller's skill or judgment is alone important." Williston on Sales, Vol. 1, pp. 609–610, § 235.

Webster's International Dictionary defines a "cull" as "something selected especially as being inferior or worthless." As defined by the witnesses, a cull includes, among other things, a brick that is underburned and consequently too soft to be regarded as structurally sound. Prior to 1958 plaintiff became a large buyer of cull bricks which it sold to builders for use in the exterior construction of homes. In 1958 plaintiff continued its policy of buying and selling cull brick for such use. Commencing in June 1958 plaintiff acquired substantial quantities of such brick from defendant. Purchases from the defendant were made, however, after plaintiff examined samples of the brick. In its letter of June 5th to defendant, plaintiff inquired: "Would it be possible for you to send us one box of the $20 brick * * *", thereby indicating its intention at the outset of negotiations to inspect samples of the brick to determine whether it was "burned

hard enough to stand up." As noted in the postscript to defendant's letter of June 13th, Mackall forwarded a sample of cull brick to plaintiff. The president of plaintiff, Albert Starr, testified that samples of cull brick were received regularly from the truck drivers. That plaintiff examined samples from time to time and was aware that the cull bricks were soft is evident from notations such as "Must be good—not too soft" that plaintiff placed on some of its purchase orders. The evidence shows that the degree of porosity of soft brick is high; that a soft brick will absorb more moisture than one that is hard. It was shown that the softness of the brick could be gaged by its ring. Mr. Starr testified that a brick could be tested for softness by placing it in water and then weighing it to ascertain its moisture content. The samples examined by plaintiff conformed to the mass of bricks as delivered. Plaintiff's highly skilled and experienced representatives were well qualified to determine upon examination and by appropriate tests whether the cull bricks were "hard enough to stand up." Plaintiff asserts that "only defendant knew the burning." But more important than the length of the burning period was the result of the burning, as exemplified in the underburned and soft condition of the bricks delivered to the plaintiff. There can be no doubt that plaintiff had ample opportunity to investigate the quality of the cull bricks and that plaintiff relied upon its own knowledge and experience rather than on defendant's skill or judgment. Pertinent in this connection is the following statement in 46 Am.Jur., Sales, § 348, p. 532:

> "As a general rule, notwithstanding goods are sold for a particular use, if the buyer himself understands what he wants and has a full opportunity to acquire a knowledge of any fact necessary to enable him to form a correct estimate, and selects such goods as he deems adapted to the intended use, there is no warranty of their fitness for such use."

Plaintiff contends that Starr's testimony that he relied on Mackall's written guarantee tends to prove reliance by plaintiff upon defendant's skill or judgment. Apart from the fact that Mackall's promise was not binding on defendant, the argument is irrelevant. Plaintiff fails to distinguish between reliance upon a promise or affirmation of fact as an ingredient of an express warranty and reliance upon the seller's skill or judgment as an element of implied warranty. An express warranty [1] arises upon contract and it is true, as the authorities cited by plaintiff show, that "As a general rule no evidence of reliance by the buyer is necessary other than that the seller's statements were of a kind which naturally would induce the buyer to purchase the goods * * *." 1 Williston on Sales, Rev.Ed., pp. 534–535. See also 35 Ohio Jur., Sales, 859. An implied warranty, however, arises by operation of law.

"Its origin and use are to promote high standards in business and to discourage sharp dealings. It rests upon the principle that 'Honesty is the best policy' and it contemplates business transactions in which both parties may profit." 46 Am.Jur., Sales, § 332, p. 514.

The law imposes an implied warranty in those cases where the buyer, having made known to the seller the purpose for which he intends to use an article, is dependent upon the seller's superior knowledge and good faith to provide him with an article reasonably fit for such purpose. In all such cases the dependency of the buyer upon the seller's superior knowledge must clearly appear. The necessity of adequate proof of the buyer's justifiable reliance on the seller's skill or judgment cannot be minimized. The plaintiff here was in as good a position as the defendant to determine whether the cull bricks were suitable for use in the exterior construction of homes. In short, the parties stood on an equal footing. Plaintiff has failed to sustain the burden of showing justifiable reliance upon the skill or judgment of defendant. The cases of Moss v. Yount, 1944, 296 Ky. 415, 177 S.W.2d 372, 151 A.L.R. 441; Drumar Mining Co. v. Morris Ravine Mining Co., 1939, 33 Cal.App. 2d 492, 92 P.2d 424 and Bouchet v. Oregon Motor Car Co., 1950, 78 Or. 230, 152 P. 888, involve, respectively, the sale of a secondhand tractor, the sale of secondhand machinery and the sale of a used truck. In none of the cited cases was the sale made to a buyer in the same line of business whose experience and knowledge in the particular business was equal to or greater than that of the seller, as is the case here. There is also a valid distinction between a used quality product and a product that is inherently defective from the time of its manufacture.

I hold there was no express warranty binding on defendant and further that under the facts there was no implied warranty of fitness.

### Defendant's Counterclaim

It is sufficient in this connection to state that the proof showed purchase by plaintiff in April 1959 of Grade A–1 brick of the value of $1,056, for which amount judgment may be entered in favor of the defendant against the plaintiff.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 52(a), 28 U.S.C.A.

An order may be made in accordance with the foregoing.

1. "§ 1315.13. Express warranty. Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. No affirmation of the value of the goods, nor any statement purporting to be a statement of the seller's opinion only shall be construed as a warranty."