FARMERS CO-OPERATIVE ELEVATOR COMPANY OF DOUGLAS, A Corporation, Plaintiff in Error,

v.

B. D. ANDERSON, Defendant in Error.

No. 38252.

Supreme Court of Oklahoma.

Feb. 17, 1959.

Crowley & Musser, Enid, for plaintiff in error.

Hugh Conway, W. E. Crowe, Enid, for defendant in error.

BLACKBIRD, Justice.

This appeal involves an action instituted by defendant in error, hereinafter referred to as plaintiff, against plaintiff in error, hereinafter referred to as defendant, to recover damages for defendant's alleged breach of an express warranty on 107 bushels of wheat plaintiff purchased from defendant. It was plaintiff's theory that he purchased the wheat to plant, or as "seed wheat" of the variety known as "Early Triumph", upon defendant's representation that it was that variety and had a germination quality of at least 90%; that, after sowing it on 120 acres of his farm, he learned that it did not possess the germination standard represented to him; and, as a result he had to purchase

other seed wheat elsewhere and plant it so late that he obtained a lessor yield therefrom than if planted earlier, when the inferior seed was planted. For damages he prayed recovery against defendant of the $2.35 per bushel price he paid for the allegedly inferior wheat in the total sum of $255.47, plus $15 to pay him for hauling same to his farm, plus $60 to pay him for tandem disking the acreage in preparation for its aforementioned second planting, plus $120 for the second planting, or drilling, plus $1,100 to pay him for the 500-bushel difference in the quantity of the wheat produced by the late planting and that which would have been produced by the early planting had the seed used germinated as represented.

The evidence adduced at the trial reasonably tends to prove, among others, the facts hereinafter related. At Douglas, in southeastern Garfield County, where defendant's office, two elevators and a feed house are located, it is in the business of selling seed and grain, among other things, and storing wheat for the Commodity Credit Corporation of the United States, hereinafter referred to merely as the "CCC". Plaintiff's farm is located west of there in or near Major County, southwest of the town of Lahoma. Due to the drought in the Spring of 1955, there was a shortage of wheat that summer in that part of the State. In July of that year, defendant had stored in its elevator, mixed, or commingled as to variety and grade, several thousands of bushels of wheat belonging to the CCC. In June or July of that year, Mr. Ed Akin, defendant's manager, conceived the idea, because of the aforesaid shortage, of defendant's purchasing said wheat from the CCC for resale to the public. He thereupon ascertained that the wheat could be purchased for $2.24 per bushel, and, at one of its meetings in July, defendant's board of directors, over the protest of at least one of its members, authorized Akin to purchase the CCC wheat for defendant at the aforesaid price and to sell it for $2.35 per bushel. In the same month, defendant

forwarded a 2-pound sample of said wheat to the State Department of Agriculture at Oklahoma City for testing, and thereafter received said Department's report, dated August 5, 1955, representing that said sample's germination quality was 90%. Said report, or a copy thereof, was posted on the outside wall of defendant's office. On August 11, 1955, defendant caused to be published in a Covington newspaper, an advertisement over its name and address, stating, among other things, that it had "Triumph Seed Wheat" for sale. On the same date, plaintiff purchased one hundred bushels of the wheat involved here, and left with defendant his personal check in the amount of $50, dated the same day, as a deposit of 50¢ per bushel on, and part payment of, the wheat's total price, with the understanding that said deposit would assure him of getting the wheat, when he returned for it and paid the balance of the purchase price. This plaintiff did, on September 19, thereafter, at the same time increasing his purchase to 107 bushels, and giving defendant another check dated that day, for the $205.47 balance due on the total purchase price of that amount. Thereafter, when plaintiff took the wheat to his farm and planted most of it as seed and failed to get a "good stand" from it, he had a small amount left from the planting tested by a Waukomis Public School instructor in vocational agriculture, who advised him in November that the wheat "germinated less than 5 percent" and that with its germination so low "it could not possibly be used for seed * * *". (Tests of two samples defendant sent the State Department of Agriculture in October, following plaintiff's purchase, had shown the wheat therein contained had a germination quality of almost 20% less than that in the first test reported in August, as aforesaid.) Plaintiff then requested defendant to return his purchase money, but defendant refused. He then obtained other seed, replanted the land with it during the latter part of October, and, after it had produced a crop, commenced the present action in March, 1957.

In its answer to plaintiff's petition, defendant denied, among other things, that it had represented the wheat plaintiff bought, or that it had sold it, to him, as seed wheat, or as possessing germination quality of 90%. It also alleged, among other things, in substance, that in purchasing the wheat plaintiff acted on his own volition and without any representations or warranties, and that if he used the wheat as seed, "he took his own chances" on its germination, growth and production, without any responsibility on the part of defendant.

Trial of the cause to a jury resulted in a verdict and judgment for the plaintiff in the sum of $1,100, together with interest thereon at the rate of six percent per annum from June 15, 1956. After its motion for a new trial was overruled, defendant perfected the present appeal.

Defendant's contention, under its Proposition No. 1, that the trial court erred in overruling the demurrer it interposed at the close of plaintiff's evidence and the motion for a directed verdict it interposed at the close of all of the evidence, is based on the premise that the evidence was insufficient to establish that defendant ever expressly warranted the wheat to plaintiff as seed wheat, though it now concedes (contrary to its position during the trial) that it sold said wheat for seeding purposes. The testimony of the plaintiff and of defendant's manager, Mr. Akin, quoted in defendant's brief, is not in harmony on this issue; plaintiff testifying that he did not see the aforementioned newspaper advertisement before his trip to defendant's establishment, but that on said trip (which was August 11th, when he left the aforementioned $50 check) Mr. Akin was the person he contacted with reference to the proposed purchase, and that when he inquired of Akin as to the availability of seed wheat there, was told: "I have plenty of good Triumph seed wheat." One excerpt from plaintiff's testimony is as follows:

"Q. Was anything said (between you and Akin) about the germination

test? A. He said,—I understood him at that time to say that it was ninety or better germination.

"Q. Did you ask him specifically about that? A. Yes.

"Q. And that's what he said? A. Yes."

On cross examination, when plaintiff was further questioned as to Akin's representations, he testified: "I asked him (Akin) if they had run a test on it, and he said, 'I had the State run a test on it', and I couldn't swear whether he said it was 90 or 92% germination, and I knew that was good enough." At one place in Akin's testimony quoted in defendant's brief, he testified that he never told plaintiff that defendant ever had any seed wheat. In view of the abundance of evidence in the record (including a Seed Dealer's license representing that it was "For the year 1955–56" and that "* * * unless cancelled * *" it was "invalid after June 30, 1956") that during the period plaintiff purchased the wheat in question, defendant was regularly selling wheat for seed, and of counsel's admission that that was the purpose for which this wheat was sold plaintiff, we regard that portion of Akin's testimony of little significance. At another place in this testimony quoted by defense counsel, Akin stated that he "couldn't truthfully say" that he "ever had any conversation with" plaintiff. We do not regard a negative statement like this as sufficient to outweigh plaintiff's more positive statements as to Akin's conversation with him and the representations therein contained; nor does it, in view of the evidence reasonably tending to show that Akin expressly warranted the wheat to plaintiff, furnish any meritorious basis for defense counsel's representation that, "there was no express warranty of any kind or nature made to the plaintiff * * *". Nor can we uphold defense counsel's representation "that the record is entirely void of any evidence" that defendant represented to the plaintiff "that the wheat would grow." We have carefully examined the entire record and find an abundance of evidence from which

the jury could reasonably have concluded that, had the wheat defendant sold plaintiff, been of the variety, and possessed the germination quality, plaintiff said Akin represented to him, it would have grown and produced a good crop.

All of the rest of defendant's argument under its Proposition No. 1, as well as its Proposition No. 2 is based, either directly or indirectly, on the testimony of defendant's witness, Ronald Miller. According to said testimony, he was employed at defendant's elevator on September 19, 1955, when plaintiff came to the elevator to finish paying for the wheat, to get more, and start hauling it all to his farm. Defense counsel contends (despite their aforementioned admission that at least the original order of 100 bushels was sold to plaintiff as seed) that Miller's testimony shows, without contradiction, that plaintiff was apprised on that occasion that the wheat he was getting was not seed wheat. The cited testimony is as follows:

"Q. I will ask you if you ever delivered any wheat to Mr. B. D. Anderson from over near Lahoma? A. He came after some.

"Q. You say he came after some; were you there when he came for it? A. Yes, sir.

"Q. He testified here that he came on the 19th of September, 1955; would that be about right? A. Somewhere along there, yes, sir.

"Q. And did you have any conversation with him at that time, as to whether that wheat he was to receive would be what would be designated seed wheat or what would be designated just wheat?

"By Mr. Conway: Object to the form of that question.

"By Mr. Crowe: Let him tell what was said or done.

"By the Court: The question was, did he have a conversation along that line. (To the witness:) You may answer the question yes, or no, whether the conversation took place.

---

"Q. Did you have a conversation with him, as I asked you this question now? A. Yes.

"Q. Will you state what that conversation was, please? A. It was raining, it seems like I recall; it was probably about the weather.

"Q. Was anything said about the type and kind of wheat that you were delivering to him at that time?

"By Mr. Conway: Objected to as leading and suggestive.

"By the Court: Overruled. He may answer the question. (To the witness:) Do you understand what the question was? A. No, sir.

"By the Court: Was anything said about the type or kind of grain sold? Was that the question, Mr. Crowley?

"By Mr. Crowley: Yes.

"By the Court: If you understand the question, Mr. Witness, answer it. A. *I don't recall whether that question came up or not,* but it seems to me it did, and we was not selling that, if it was,—and I am sure I quoted him that that wheat was not for seed, just for wheat purposes only.

"By Mr. Crowe: If the Court please, we move that answer be stricken, because *he testified he couldn't remember whether he had that conversation or not.*

"By the Court: It is true that the witness did make such a predicate in his answer. *I am going to leave it to the jury, for whatever it may be worth.* Exceptions allowed the plaintiff.

"Q. Did he say anything at that time, in view of what you say you said? Did he respond, or make any remark about that? A. No, sir, I guess he knew that—

"Q. No, no, not that.

"By the Court: Mr. Witness, did he make any response, as Mr. Crowley put the question to you? Did he make any remark? You may answer that question, did he make any remark in response to that? Now you can answer

that yes or no. If you don't remember, say so. A. *I don't remember whether he—*it's been two years. *I don't remember exactly the words of the conversation, exactly."* (Emphasis ours.)

We do not agree with defense counsel's apparent view that the above testimony bound the trier of facts to conclude that plaintiff was apprised before, or at the time, he accepted delivery of the wheat, that it was not seed wheat. While it is true that, when plaintiff was testifying, he was never interrogated specifically about the particular conversation to which the above quoted testimony pertained, the tenor of his testimony, and the reasonable inference to be drawn therefrom, was that he never knew, until after he planted it, that the wheat he got from defendant was not seed wheat of the variety and germinative quality he had originally been lead to believe he purchased, which testimony was, of course, contrary in effect to the testimony counsel sought to elicit from Miller. The trial court properly left to the jury (as the above quoted record shows) the task of appraising Miller's testimony to determine what he intended to, and actually did, testify and of comparing and weighing its substance and probative value, if any, along with other evidence in the case, in determining whether the preponderance of the evidence as a whole was on the side of the plaintiff or of the defendant. We regard the situation here in substantially the same view we had of a similar one in Henderson v. Gifford, Okl., 318 P.2d 404, 409, and think that the quoted testimony does not necessarily have the binding force of *positive,* uncontradicted and unimpeached testimony under the rule there quoted. In this connection, notice also our holding in Sparks v. General Mills, Inc., Okl., 262 P.2d 155, 156, as to "indefinite, equivocal, ambiguous and inconsistent" evidence.

■ Under its Proposition No. 2, defendant refers to the fact that, according to the evidence, the "only money actually paid out by the plaintiff * * *" was the $255.47 he paid defendant as the purchase price

of the wheat for the first planting, and that the other items of damage he claimed, except that for diminution of yield, were for work and hauling he did himself (the reasonable value of which he testified to). It is defendant's contention that since plaintiff paid no one for the items of hauling disking or drilling, he is not entitled to claim damages therefor. The only authorities counsel cite for this contention however, and their argument concerning the trial court's alleged error in giving its Instruction No. 10, are to the effect that a buyer of seeds for planting cannot recover consequential damages if he knew of the inferior quality of the seed before planting. As we have already demonstrated that neither the trial court, nor the jury, was bound to conclude from the evidence that plaintiff knew, before he planted it, that the seed was inferior, but that, on the contrary, the opposite conclusion might quite reasonably and justifiably have been arrived at, none of said authorities are applicable; and defendant's arguments merit no further consideration.

As we have found in the arguments presented, no cause for reversing the trial court's judgment it is hereby affirmed.

■ Plaintiff calls our attention to the filing of a supersedeas bond and requests judgment thereon. The record reflects that such bond is in the principal amount of the judgment, with interest, includes court costs, and is executed by defendant, as principal, and Fidelity & Deposit Company of Maryland, as surety. In accord with this court's Rule 31 (12 O.S.A. c. 15 Appendix) and plaintiff's request, judgment is here rendered on said bond, against said Surety, as well as the defendant, in the amount of $1100.00, with interest thereon at the rate of 6% per annum from June 15, 1956, together with court costs, until paid; and the trial court is directed to enforce this judgment as if rendered in said court.

DAVISON, C. J., WILLIAMS, V. C. J., and HALLEY, JOHNSON, JACKSON, IRWIN and BERRY, JJ., concur.