LESTER LADEWIG AND OTHERS, d.b.a. LADEWIG
BROTHERS, v. GLENCOE MILLS, INC.

113 N. W. (2d) 80.

January 19, 1962—No. 38,324.

*Daniel F. Foley* and *James E. Zeug,* for appellants.
*Sawyer, Sawyer & Darby* and *Hubert G. Smith,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from a judgment of the district court.

This is an action for damages brought by plaintiffs, Lester, Lyle, and Elmer Ladewig, Jr., doing business as Ladewig Brothers, against defendant, Glencoe Mills, Inc.

Plaintiffs alleged in their complaint that at various times from 1957 to 1959, inclusive, defendant had warranted to plaintiffs, through advertisements in the U. S. Trout News, written correspondence with plaintiffs, and oral representations, that a certain trout food which it

sold was a "complete trout food" requiring no supplementary meat feeding; that plaintiffs were thereby induced to buy said trout food for which they paid a valuable consideration; that said trout food was not a complete trout food and required supplementary meat feeding; that, relying upon the express and implied warranties of defendant, plaintiffs used its trout food exclusively for feeding 30,000 of plaintiffs' 1-year-old trout; that in consequence 17,700 trout, with a reasonable value of $6,372, died; that the surviving trout were damaged and depreciated in the sum of $2,500; and that plaintiffs were put to expense and work to their damage in the sum of $2,500 in an attempt to mitigate damages.

Defendant, in its answer, admitted the sale of trout food to plaintiffs at various times in 1958 and 1959 but denied every other allegation in the complaint.

Plaintiff Lester Ladewig testified that plaintiffs entered into the trout farm business in Winona County in 1957; that before doing so they visited other trout farms to obtain information as to the best methods of raising trout; that they consulted with several persons who had raised trout, including G. W. Atkinson, hereinafter referred to; that they looked over other trout farms and read the national magazine publication regarding this field; and that in the March-April 1957 issue of the U. S. Trout News they read an advertisement of defendant which stated:

"Now You Can Buy

Glencoe Quality Trout Feeds

In Two Types

Standard and Enriched

(*With Limited Meat Feeding*) (*Complete Dry Trout Food*)

Both of These Are Available in Meal, Granules and 5 Sizes of Pellets

Ask for Prices and Quantity Discounts  F. O. B. Your Town.

Also let us quote you on special custom pelleting and addition of sulfa drugs.

Glencoe Mills, Inc.
1011 Elliott Ave.
Glencoe, Minnesota
Phones 665 and 666"

Lester said that after reading the advertisement plaintiffs were of the opinion that defendant had a complete trout food which required no supplementary meat. On December 4, 1957, after he had read a number of defendant's advertisements, the witness wrote defendant inquiring about the feed and its price and requesting that one of defendant's salesmen stop at plaintiffs' place, to which letter defendant replied. Lester said that from the information plaintiffs had they were of the opinion that defendant had two types of trout food, the standard, needing meat supplement, and the enriched food, which did away with the feeding of meat. In any event, according to his testimony, plaintiffs relied on what they had read in the magazine advertisements and the price list they had received from defendant and bought their first feed from defendant in January 1958. He said they bought the enriched feed rather than the other feed because they "wanted to do away with the feeding of meat or liver."

Lester also testified that Ronald Edstrom, the assistant manager and nutritionist for defendant, first called at the farm of plaintiffs in the latter part of April 1958; that he looked at the trout ponds and trout and said plaintiffs had an "ideal situation" for raising trout; that Edstrom pointed out that defendant had two types of trout food, the enriched—which was a complete food where no meat feeding was necessary—and the standard—a cheaper food which would have to be supplemented with a meat product; and that plaintiffs believed him.

At that time plaintiffs had some trout which they had purchased and some that were newly hatched. Lester claimed that he talked with Edstrom about feed for those trout and was told to begin feeding them the complete granule feed sold by defendant. He also said that when he questioned Edstrom about feeding the trout meat supplement, Edstrom told him not to do so because if he did the trout would not take their granules.

Lester stated that Edstrom again came down to see their trout about November 25, 1958, and told him that their trout setup "was very good, our trout looked real good, everything was ideal." The witness said that at that time they had approximately 30,000 trout "out of the hatch" ranging in size from 4 to 7 inches and that they were then feeding

them liver also but that Edstrom said in effect that it "was sort of foolish" to do so as it was not necessary. The reason Lester gave for then feeding liver was that, although Edstrom had assured plaintiffs in the spring that it was all right to feed the granules to the trout, as it was a complete food, when they tried that process the small trout began to die. They called Carl Nelson, superintendent of the Crystal Springs hatchery in Winona County and he suggested that they feed liver, which they continued to do with the enriched trout feed until Edstrom visited them in November 1958. Lester further stated that after that time they fed only the enriched food sold by defendant; that in the latter part of February 1959 the fish began to die. From that time until May 5, 1959, about 17,800 trout died.

Ronald Edstrom, however, testified that he never made a sale until he gave an explanation that meat feeding might be necessary and "fully explaining that in this particular area [southern Minnesota] he would have to supplement feed." It was his recollection that he first called at plaintiffs' farm in May 1958 to see their facilities, to help them, and to "explain our trout food." He said also that he recommended to plaintiffs that they contact people who were well versed in the engineering and making of trout pools. He admitted that he told plaintiffs that he was the "nutritionist" for defendant but said that he did not claim to be an expert in the proper feeding of trout, as "nutrition and raising of trout are two different things." He said that he had told plaintiffs in a previous letter that defendant sold two trout foods, the standard and the more expensive kind called the enriched complete dry food. When questioned as to whether, generally speaking, it was advisable in this area to feed meat liver to trout in addition to dry feed he replied that it was common practice if the "fish are being raised in large commercial quantities and might grow faster in the ponds and might become crowded." In view of our decision here, it will serve no useful purpose to further detail his testimony.

The case was tried before a jury, and at the close of plaintiffs' case, defendant moved for a directed verdict on the ground that the evidence conclusively showed that there had been no reliance on the part of plaintiffs and that no evidence had shown what caused the fish to

die. The court granted the motion, and this appeal was taken from the judgment entered for defendant.

It was the opinion of the trial court in directing the verdict that the requisite facts upon which the cause could be based were essentially within the domain of expert testimony and that no witness testifying for plaintiffs was an expert. The court further stated that in its opinion all the circumstances surrounding the case merely indicated a possibility that plaintiffs' theory was true and furnished nothing more than materials in the realm of speculation and conjecture but did not furnish a basis to reasonably warrant the inference that the trouble with the trout was caused by feed purchased from defendant.

The only assignment of error which we need consider is whether the court erred in directing the verdict. Plaintiffs claim that it constituted reversible error. They contend that they proved a prima facie case by showing proper facilities and sufficient oxygen for raising trout; advertisements of defendant as to complete trout food and their reliance on such advertisements; purchase of the food; representations of the nutritionist of defendant and reliance on the representations; healthy trout taken off a meat supplement because of such representations; and the death of 17,800 trout as a result of malnutrition.

Defendant, on the other hand, maintains that, looking at the evidence in the light most favorable to plaintiffs, the trial court could not have done otherwise than to direct a verdict inasmuch as it would appear that the only thing plaintiffs proved was that they experienced an unusual loss.

Plaintiffs argue that the court committed reversible error in its ruling with reference to certain testimony of G. W. Atkinson, one of their witnesses. Atkinson testified that he is the manager of the Peterson Trout Farm, Peterson, Minnesota, and has been so engaged for 14 years; that they raise trout at the farm and sell them to other trout farms; that in connection with his duties he has been active in raising trout, has bought feed for them, and has had experience with trout diseases; that he visited plaintiffs' trout farm in the spring when "they were having trouble"; that they had quite a few dead fish and he was told by plaintiffs that their trout were dying in large numbers. It was his opinion, however, that plaintiffs had a good trout "set up." The

witness said that while he was at plaintiffs' farm he examined some of the dead trout by cutting them open and that he also examined some of the sick ones. After some objection by defendant as to his qualifications, Atkinson was asked:

"Q. After you examined the dead fish out there, and you testified you cut them open, did you form any opinion at that time as to what caused those fish to die?

"A. Yes.

"Q. Would you state that opinion?"

Objection was made by defendant that the witness was still not qualified to answer, which objection was overruled. Atkinson then answered:

"A. Well, I would say that the fish were suffering from malnutrition.

"Q. And that caused them to die?

"A. Yes.

"Q. And the live, sick fish that you examined, did you form an opinion as to what caused those fish to become ill?

"A. It would be the same reason."

He was later asked a long hypothetical question involving the facts of this case and was requested to give an opinion as to the cause of death of the trout. He replied:

"In our operation we feed meat with our dry pellets and that's what I base my opinion on, what was wrong with these fish, that they had been off the meat."

Defendant moved that the answer be stricken on the ground that it was not qualified and based "on something that is not proper." The trial court questioned the witness as to whether he had any other basis for his opinion except his operation at Peterson, and the witness replied in the negative. The court then ordered the opinion stricken from the record. It is this action of the court which is plaintiffs' primary assignment of error on appeal.

The record here also shows that plaintiffs had their fish examined in April 1959 by Robert Peiper, a biologist at the United States Fish Cul-

tural Station at LaCrosse, Wisconsin. However, he did not appear as a witness, so the only testimony offered concerning the cause of death by anyone with experience in the trout-raising business was that of Atkinson. Lester Ladewig, one of the plaintiffs, was asked if he had examined the surviving trout after the others died. He answered, "Yes." He was then asked if he had formed an opinion based on his knowledge of the trout business and his actual knowledge in connection with the sick and dead trout, and he answered, "Yes." The court did not permit him to give his opinion upon objection by defendant that there was no foundation and that the witness was not qualified.

With respect to a directed verdict, this court said in Erickson v. Strickler, 252 Minn. 351, 354, 90 N. W. (2d) 232, 235:

"In directing the verdict for the defendant, the trial court was of the view that any verdict for the plaintiff would necessarily rest upon conjecture and speculation. In reviewing the plaintiff's assignment of error as to the directed verdict, it is necessary to keep in mind that a motion for a directed verdict accepts the view of the evidence most favorable to the adverse party and admits the credibility, except in extreme cases, of the evidence in his favor and all reasonable inferences to be drawn therefrom. The motion for a directed verdict should be granted only in those unequivocal cases where in the light of the evidence as a whole it would clearly be the duty of the trial court to set aside a contrary verdict as being manifestly against the entire evidence, or where it would be contrary to the law applicable to the case."

See, also, Kolatz v. Kelly, 244 Minn. 163, 69 N. W. (2d) 649; 19 Dunnell, Dig. (3 ed.) § 9764.

It is our opinion that under the record here the case should have been submitted to the jury. We realize that the question as to the cause of death of the trout was a close one. However, it does seem that because of the somewhat singular and unique nature of the business of raising trout on a commercial basis a jury might well consider the experience and background of Atkinson in determining what caused the death of the trout. We also believe that a jury issue existed with respect to the claims of plaintiffs that they were told by defendant's nutritionist that the product sold them by defendant was sufficient in itself

to feed the trout properly without a meat supplement. For these reasons, the case is remanded for a new trial.

Reversed and remanded for a new trial.