KENNETH WOODRUFF *v.* CLARK COUNTY FARM BUREAU COOPERATIVE ASSOC., INC., ET AL.

[No. 671A120. Filed August 14, 1972.]

*Rex P. Killian, Ruckelshaus, Bobbitt & O'Connor,* of counsel, of Indianapolis, for appellant.

*Larry R. Fisher, Stuart, Branigin, Ricks and Schilling,* of counsel, of Lafayette, for appellees.

### STATEMENT OF THE CASE AND FACTS

BUCHANAN, P.J.—This is an appeal from a summary judgment entered against plaintiff-appellant, Kenneth Woodruff (Woodruff), on his Complaint for damages for breach of

warranty, misrepresentation, and fraud arising from the sale of chickens to Woodruff by defendants-appellees Clark County, Jackson County, and Indiana Farm Bureau Cooperative Associations, Inc. (Farm Bureau) and Glen L. Searcy (Searcy).

From 1945 until 1960 Woodruff was engaged in the business of raising broiler chickens near Remington, Indiana. In 1960 he phased out his broiler business and began raising chickens for the production of eggs. While Woodruff had no formal education in poultry science, he was capable of performing limited postmortems on his own chickens to determine the cause of death. In addition, Woodruff also attended some short courses on poultry science and egg grading at Purdue University lasting from two to two and one-half days.

In July of 1964, Ken Bowlin (Bowlin), a Farm Bureau representative, discovered that Woodruff intended to replace his flock of chickens. Farm Bureau did not have any chickens in Woodruff's area, but Bowlin contacted Woodruff in an attempt to persuade him to try Farm Bureau chickens.

As a consequence of this initial conversation, Woodruff met with Searcy and other Farm Bureau representatives at Indianapolis and travelled to the Clark County Farm Bureau to observe its flock of chickens. While at the Clark County Farm, Woodruff observed that the chickens were out of feed and that they were "congested." Woodruff considered the Clark County facilities inadequate compared to modern poultry facilities. After viewing these conditions Woodruff testified that he was assured by Farm Bureau that he would get only the good chickens and that "they would do a good job in my chicken-house."

Woodruff further noted that he did not raise any questions at the Clark County farm regarding vaccination or mortality rates because he had confidence in Farm Bureau and that it was customary for chicken farmers to vaccinate against coccidiosis at an early stage. He presumed that "they had been in it for a long time and they certainly had brains enough to know what to do, and it was not for me to ask about it."

Following the examination of the Clark County chickens, Woodruff and the Farm Bureau representatives travelled to Jackson County, where they viewed another flock of chickens. Woodruff again observed that the chicken feeders were empty, the chickens were badly stunted and their feathers were ruffled. While he generally condemned the Jackson County operation, the response to his comments at Jackson County was much the same as at the Clark County farm—that he would get only the good chickens, "that the chickens would be culled" and he "would get only good birds."

After observing the Jackson County birds, Woodruff and the Farm Bureau representatives drove back to Indianapolis. At some time during the return trip to Indianapolis, Farm Bureau and Woodruff entered into an oral agreement whereby Woodruff agreed to purchase chickens from Farm Bureau for $1.55 per chicken.

On July 23, 1964 the chickens were delivered to Woodruff with Mr. Wayne Isaacs, of the Farm Bureau, present. A total of 7,622 chickens were shown delivered on the receipts hereinafter referred to, and Woodruff and the delivery man culled unacceptable chickens and returned them to Farm Bureau. Woodruff himself culled approximately 1,400 chickens out of the total delivered, and the delivery man also culled chickens found to be unacceptable. Woodruff did understand that he could return any of them that appeared to unacceptable. At the time of delivery Woodruff was advised that the chickens would develop in the proper manner i.e. that they would "bloom out or straighten up and fly right":

"* * * I was led with the idea that they would—what they call 'bloom out' or straighten up and fly right and so forth, you know, when they got more space and back on full feed because at that time they were attempting to produce these chickens with a restricted feeding program. They said, 'After you get them on full feed their weight will pick up, you know, and their feathers will tighten up and they will go on from there,' but the case didn't develop this way."

At the time of delivery, Woodruff was asked by the delivery man to sign the following two documents "to show delivery," both of which were entitled "Started Pullet Delivery and Acceptance Receipt," (the receipts), and were identical except as to the filled-in blanks:

DEFENDANT'S EXHIBIT I

STARTED PULLET DELIVERY AND
ACCEPTANCE RECEIPT

7-23-64

Pullets Grown and Delivered by          Clark Co. F.B. Coop.

Pullets Inspected by       Ray Durin

Delivered to        Kenneth Woodruff

Received from       Clark Co. F.B. Coop.       (Number) 4120 pullets       (22 wks.)       in good condition.  It is understood and agreed that no representations are made as to the present or future health and well being, or freedom from any disease of any pullets sold, and that upon accepting delivery, Purchaser shall have no recourse to Seller or Grower and by such acceptance admits that no warranties, express or implied, have been made by the Seller or Grower as to the Quality or condition of the pullets immediately before housing.  Unless pullets are rejected by Purchaser for good cause shown, they shall be deemed to be accepted in an "as is" condition.  Grower or Seller does not warrant these pullets to be free of any disease, or detrimental condition, the existence of which could not be ascertained at the time of delivery, nor shall Seller or Grower be responsible for damages, if any, from flock contamination caused or alleged to have been caused by such disease.

―――――――――――――                    (signed) Kenneth J. Woodruff
       (Paid)                    (Signature of Purchaser)

Defendant's Exhibit 2, is identical to Exhibit 1 except the blank spaces were filled in as follows:

Line 1—Date: 7-24-64

Line 2—Jackson Co. F.B. Coop.

Line 3—Wayne Isaacs

Line 5—Jackson Co. F.B. Coop. (Number) 3502

Line 6—Age 21

While Woodruff acknowledged that both receipts bore his signature, in his deposition he recalled the facts surrounding the signing of these documents this way:

Q. Now, Mr. Woodruff, this is—Exhibits 1 and 2 were documents that were given to you and which you looked at before you signed, isn't this right?

A. Not that I recall. I don't recall even seeing them.

Q. You are saying that you have never seen those documents before?

A. I never read them over, so help me.

Q. Are you in the habit of signing a document that is a page long and almost completely all typed without reading it?

A. A good percentage of the time this is done when you have confidence in the people with whom you are dealing.

\* \* \*

Q. Did you discuss those documents with Wayne Isaacs?

A. I did not. I didn't even recall seeing them.

Q. Did Wayne Isaacs indicate to you the contents of those documents?

A. No. I don't even know whether Wayne Isaacs had them or if Glen Searcy had them. To the best of my knowledge, this is the first time I have seen them. It is definitely the first time I read them. As to who had them when I apparently signed them is beyond me. That sales ticket you have in your hand—

As the chickens progressed in age many of them were dying, so in the early part of August 1964, Woodruff contacted

Bowlin concerning the mortality rate. At Bowlin's insistence, Woodruff called the Indianapolis Farm Bureau office and requested that someone examine the chickens. Subsequently, Searcy and two other Farm Bureau representatives visited Woodruff and concluded that the chickens were in no great danger. Nevertheless, the high mortality rate continued, so Woodruff again contacted Farm Bureau representatives, who returned a second time to examine the chickens. At the second meeting, Woodruff was asked if he was using anything in his feed for coccidiosis. Woodruff replied:

"I've got nothing in my feed for coccidiosis; when chickens get this age you are not supposed to have anything in your feed for coccidiosis. Any normal chicken from any reputable company will have their immunity by the time they are twenty weeks old."

The Farm Bureau representatives then departed without giving Woodruff any indication as to the condition of the birds.

Woodruff began feeding the birds a special feed, but the mortality rate continued at the same pace. The condition did not improve and eventually Woodruff's poultry business was destroyed. Woodruff testified that he lost approximately $45,000.00 of gross income because the chickens never exceeded sixty percent of production capabilities. Woodruff also testified that ultimately approximately 2500 chickens died and probably 1600 more were condemned because of their condition.

In August 1966, Woodruff filed a Complaint against Farm Bureau for damages for breach of warranty, misrepresentation and fraud.

After certain discovery and the filing of affidavits relative to a Motion for Summary Judgment filed by Farm Bureau, the Special Judge made certain Findings of Fact on July 21, 1970, which are as follows:

"The court has carefully gone over the arguments presented by the parties and the conditional examination of the

plaintiff. The examination of the plaintiff clearly indicates that he was in the poultry business for some twenty odd years.

The chickens in question were purchased July 24, 1964; at the time of the purchase the chickens were observed by the plaintiff and at the time of the delivery they were again observed by the plaintiff. The examination clearly points out that these chickens were culled and that some twelve hundred were sent back at the time of delivery. Plaintiff further represents that he could have sent all the chickens back if he had so desired.

It further appears that no specific representations were made by the defendant as to the chickens, both from his testimony and from Exhibits No. 1 and No. 2.

Therefore in view of the above mentioned facts, *together with the execution of Defendant's Exhibits No. 1 and No. 2 by the plaintiff*, there would be no liability on the part of the defendant and defendant's motion for summary judgment should therefore be sustained.

Therefore the court has made the following entry in this cause: 'Defendant's motion for summary judgment, having been heretofore argued and considered, the court being duly advised, does now sustain said motion for summary judgment.' Defendant ordered to prepare order book entry along the lines of the above mentioned finding." (Emphasis supplied.)

Thereafter, on July 24, 1970, the court sustained the Farm Bureau's Motion for Summary Judgment.

Woodruff timely filed his Motion to Correct Errors, which was overruled.

ISSUES—The intriguing general question for decision in the sale of these fowl is:

Did the trial court commit reversible error by determining no genuine issue of material fact existed as to express or implied warranties and by relying in part at least on the validity of the disclaimers in the Receipts in making such a determination?

This question, in turn, breaks down into four parts:

ISSUE A. Should warranties of merchantability and fitness

for a particular purpose be implied as a matter of law upon the sale of the chickens by Farm Bureau to Woodruff?

ISSUE B. Was the disclaiming language in the Receipts insufficient as a matter of law to negate the implied warranties of merchantability and fitness for a particular purpose?

ISSUE C. Was there a material issue of fact presented as to the existence of express warranties?

ISSUE D. If a material issue of fact does exist as to any express warranties, are they negated by the disclaimers in the Receipts?

Woodruff claims issues of fact existed as to express and implied warranties; that the Receipts do not satisfy the test of reasonableness prescribed by the Uniform Commercial Code, that the question of whether or not Woodruff was aware of the disclaimer was a question of fact for the jury; that an issue of fact existed as to whether Woodruff was fraudulently induced to sign the Receipts.

On the other hand, Farm Bureau asserts that the disclaimer was sufficient to negate all warranties, express or implied, and that the terms of the disclaimer were, in fact, a part of the contract since the oral agreement reached by Woodruff and Farm Bureau did not constitute a complete contract.

DECISION—It is our opinion that genuine issues of material fact arose as to the existence and violation of express warranties and as to the violation of the implied warranties of merchantability and fitness and that the disclaiming language in the Receipts was insufficient as a matter of law to negate either implied or expressed warranties and therefore the granting summary judgment was reversible error.

ISSUE A.—In the sale of the chickens by Farm Bureau to Woodruff, implied warranties of merchantability and fitness for a particular purpose arose as a matter of law.

In 1963 Indiana adopted the Uniform Commercial Code (UCC) as part of its statutory law on commercial transactions. IC 1971, 26-1-1-101, Ind. Ann. Stat. §§ 19-1-101 *et seq.* (Burns 1964). The specific sections creating implied warranties provide:

19-2-314. Implied warranty—Merchantability—Usage of trade.— (1) *Unless excluded or modified* (section [19-]2-316]), *a warranty* that the goods shall be merchantable *is implied* in a contract for their sale *if the seller is a merchant* with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must at least be such as

(a) pass without objection in the trade under the contract description; and

(b) in the case for fungible goods, are of fair average quality within the description; and

(c) *are fit for the ordinary purposes for which such goods are used;* and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified (section [19-]2-316) other implied warranties may arise from course of dealing or usage of trade.

19-2-315. Implied warranty—Fitness for particular purpose.—Where *the seller* at the time of contracting *has reason to know any particular purpose* for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, *there is unless excluded or modified* under the next section *an implied warranty that the goods shall be fit for such purpose.* (emphasis supplied.)

With no previous Indiana case law interpreting these provisions (and IC 1971, 26-1-2-316, § 19-2-316 discussed under

ISSUE B) to guide us we look to sister states with identical UCC provisions.

The effect of the unambiguous language of statutes like IC 1971, 26-1-2-314, Ind. Ann. Stat. § 19-2-314, *supra,* is to create an implied warranty of merchantability in all contracts for the sale of goods with respect to which the seller is a merchant,—unless that warranty is specifically excluded or modified. The term "merchantable" implied that the goods sold conform to ordinary standards of care and that they are of average grade, quality and value of similar goods sold under similar conditions. *McAfee* v. *City of Garnett* (1970), 205 Kan. 269, 469 P. 2d 295. Under the warranty of merchantability, then, the seller warrants that the item sold is reasonably fit for the general purpose for which it was manufactured and distributed. *Tinnerholm* v. *Parke, Davis & Co.* (D.C. N.Y. 1968), 285 F. Supp 432.

In addition to this general implied warranty of merchantability, a more specific implied warranty is fashioned by IC 1971, 26-1-2-315, Ind. Ann. Stat. § 19-2-315, *supra,* as to the fitness of the goods for a particular purpose. It arises in all sales of goods when the seller has reason to know a specific purpose for which the buyer intends to use the goods and if the buyer relies on the seller's skill to select and furnish suitable goods. *Kirk* v. *Stineway Drug Store Co.* (1963), 38 Ill. App. 2d 327, 187 N. E. 2d 307; *Knab* v. *Albens Irving Park, Inc.* (1964), 49 Ill. App. 2d 371, 199 N. E. 2d 315. The implied warranty of fitness guarantees that the goods are reasonably fit for the *particular purpose* for which the buyer purchased the goods. *Kobeckis* v. *Budzko* (Maine 1967), 225 A. 2d 418.

These implied warranties of merchantability and fitness for a particular purpose do not arise out of an agreement between the parties; they may even exist when no specific promise has been made by the seller to the buyer. *Intrastate Credit Service, Inc.* v. *Pervo Paint Co.* (1965), 46 Cal. Rep. 182, 236 C. A. 2d 547; *Vernali* v.

*Centrella* (1970), 280 Conn. Super. 476, 266 A. 2d 200. Thus, they are imposed *by operation of law* for the protection of the buyer, and they must be liberally construed in favor of the buyer. *Moosbrugger* v. *McGraw-Edison Co.* (1969), 284 Minn. 143, 170 N. W. 2d 72; *Dougall* v. *Brown Bay Boat Works & Sales, Inc.* (1970), 287 Minn. 290, 178 N. W. 2d 217; *Elliott* v. *Lachance* (1969), 109 N. H. 481, 256 A. 2d 153; *Kriegler* v. *Eichler Homes, Inc.* (1969), 269 Cal. App. 2d 224, 74 Cal. Rep. 749; *Houston-Starr Co.* v. *Berea Brick & Tile Co.* (D.C. Ohio 1961), 197 F. Supp. 492; *L. O. Whybark Co.* v. *Haley* (1962), 37 Ill. App. 2d 22, 184 N. E. 2d 798; *Chandler* v. *Anchor Serum Co.* (Kan. 1967), 426 P. 2d 82; *Wood* v. *Hub Motor Co.* (1964), 110 Ga. App. 101, 137 S. E. 2d 674; *Nettles* v. *Imperial Distributors, Inc.* (W. Va. 1968), 159 S. E. 2d 206.

The facts before us indicate no dispute that Farm Bureau is a merchant with respect to the chickens it sold Woodruff—it is in the business of selling chickens, among other things, for the purpose for which Woodruff purchased them. Consequently, an implied warranty of merchantability did arise *by operation of law* from the sole fact that Farm Bureau was a regular merchant with respect to the sale of chickens. Moreover, Farm Bureau knew the particular purpose for which Woodruff intended to use these chickens, *i.e.*, production of eggs. This knowledge is indicated by the fact that Farm Bureau initially contacted Woodruff hoping to persuade him to purchase Farm Bureau Chickens for the production of eggs.

While Woodruff had raised broiler chickens for some fifteen years he was relatively new to the egg production business. His deposition indicates that he had confidence in the people he was dealing with and that he relied on their skill and judgment to select and furnish suitable chickens for the production of eggs.

Thus, a material issue of fact existed as to whether the implied warranties of merchantability and fitness for a particular purpose were violated. Unless otherwise excluded or modified, they remained in full force at the time of the

sale and delivery of the chickens by Farm Bureau to Woodruff. The effect of the disclaimers then becomes paramount.

ISSUE B—It is our opinion that the disclaiming language in the Receipts is insufficient as a matter of law to negate the implied warranties of merchantability and fitness for a particular purpose.

IC 1971, 26-1-2-316, Ind. Ann. Stat. § 19-2-316 (Burns 1964) provides for the exclusion or modification of express and implied warranties:

19-2-316.  Exclusion or modification of warranties.— (1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article [Chapter] on parol or extrinsic evidence (section [19-]2-202) negation or limitation is inoperative to the extent that such construction is unreasonable.

(2)  Subject to subsection (3), *to exclude* or modify *the implied warranty of merchantability* or any part of it *the language must mention merchantability and* in case of a writing *must be conspicuous,* and *to exclude* or modify *any implied warranty of fitness the exclusion must be* by a writing and *conspicuous.* Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

(3)  Notwithstanding subsection (2)

(a)  unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is," "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is not implied warranty; and

(b)  when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and

(c)  an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.

(4) Remedies for breach of warranty can be limited in accordance with the provisions of this Article [Chapter] on liquidation or limitation of damages and on contractual modification of remedy (sections [19-]2-718 and [19-]2-719). (emphasis supplied)

Disclaimers of implied warranties under IC 1971, 26-1-2-316, § 19-2-316, *supra,* are not favored and are strictly construed against the sellers for reasons of public policy. *Admiral Oasis Hotel Corp.* v. *Home Gas Industries, Inc.* (1966), 68 Ill. App. 2d 297, 216 N. E. 2d 282.

In order to exclude or modify an implied warranty of merchantability under IC 1971, 26-1-2-316(2), § 19-2-316(2), (herein referred to as Number 2), the disclaimer "must mention merchantability" and the written exclusionary language "must be conspicuous." The disclaiming language in the Receipts omits any such reference, and further none of the language of the disclaimer is in any way made "conspicuous."

By the unmistakable language of Number 2, neither of the implied warranties of merchantability and fitness are excluded or negated by the attempted disclaimer. The exclusionary language must be written and it must be conspicuous. *Hunt* v. *Perkins Machinery Co.* (Mass. 1967), 226 N. E. 2d 228; *Zabriskie Chevrolet, Inc.* v. *Smith* (1968), 99 N. J. Super. 441, 240 A. 2d 195. "Conspicuous," as used within the meaning of § 19-2-316, *supra,* is defined in IC 1971, 26-1-1-201(10), Ind. Ann. Stat. § 19-1-201(10) (Burns 1964) thusly:

" 'Conspicuous': A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON-NEGOTIABLE BILL OF LADING) is conspicuous. *Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color.* But in a telegram any stated term is 'conspicuous.' Whether a term or clause is 'conspicuous' or not is for decision by the court." (Emphasis supplied.)

Interpreting IC 1971, 26-1-2-316(3), Ind. Ann. Stat. § 19-2-316(3), (herein referred to as Number 3) is not so easy. Number 2 and Number 3 obviously interrelate as Number 2 is "subject" to Number 3 and Number 3 refers back to Number 2 by use of the word "notwithstanding." Number 3 provides that if expressions like "as is" are used in the exclusionary language any implied warranties are negated. It also provides other conditions which must exist in order to negate implied warranties, none of which are applicable here because of the conclusion we reach requiring exclusionary language to be conspicuous.

The exclusionary language of the Receipts does contain a clause that pullets accepted by a purchaser "shall be deemed to be accepted in an 'as is' condition." While this disclaiming language is set out in quotation marks, it is hardly conspicuous.

The problem is to determine whether the conspicuous requirement of Number 2 is carried over to and becomes a part of Number 3 so that implied warranties are not negated unless expressions like "as is" are conspicuous. The close interrelation of these two sections is manifested by their like intent to call the buyer's attention to the exclusion of implied warranties and it would do violence to their stated purpose to do otherwise than imply that excluding expressions like "as is" must be conspicuous. This interpretation harmonizes with the basic purpose of the UCC which is designed to protect purchasers from surprise.

With no Indiana cases to guide us, we seek and find succor from foreign case law and commentators.

The official comment to UCC § 2-316 reads:

"This section is designed principally to deal with those frequent clauses in sales contracts which seek to exclude 'all warranties, express or implied.' *It seeks to protect a buyer from unexpected and unbargained language of disclaimer* by denying effect to such language when inconsistent with language of express warranty and permitting the exclusion of implied warranties only by conspicuous language or other circumstances which protect the buyer from surprise." (Emphasis supplied.)

The Indiana Comment to Ind. Ann. Stat. § 19-2-316, *supra*, counterpart to UCC § 2-316, reads as such:

"* * * The burden is put on the seller to disclose to the buyer what is being done.

\* \* \*

The effective language suggested in subsection (3) is not very different from what naturally satisfies the requirements of subsection (2); *the main import of the 'notwithstanding' in subsection (3) would be, therefore, to eliminate the requirement of a writing, demanded in subsection (2)."* (Emphasis supplied.) *See* also: *Gindy Mfg. Corp.* v. *Cardinale Trucking Corp.* (1970), 111 N. J. Super. 383, 268 A. 2d 345; *Regan Purchase & Sales Corp.* v. *Primavera* (1972), 68 Misc. 2d 858, 328 N. Y. Supp. 2d 490.

In 1 Hawkland, *A Transitional Guide to the Uniform Commercial Code*, 76-78 (A. L. I. 1964), Professor Hawkland interprets #3 in the same way:

*"While the subsection does not explicitly so provide,* it would seem that *these phrases* and expressions *would have to be stated conspiciously* to become effective disclaimers. Such a requirement is consistent with the general rule that the disclaimer must 'call' the risk to 'the buyer's attention' and 'make * * * plain that there is no implied warranty.' " (Emphasis supplied.)

While we are unable to find any authority which specifically *excludes* the "conspicious" requirement from subsection (3), we note that an excellent treatment of this question appears in *Gindy Mfg. Corp.* v. *Cardinale Trucking Corp., supra,* where the court was concerned with the identical question:

"It does not make sense to require conspicious language when a warranty is disclaimed by use of the words 'merchantability' or 'fitness' and not when a term like 'as is' is used to accomplish the same result. It serves no intelligible design to protect buyers by conspicious language when the term 'merchantability' is used, but to allow an effective disclaimer when the term 'as is' is buried in fine print. Nor does it make sense to require conspicious language to disclaim the implied warranties of merchantability and fitness and not impose a similar requirement to disclaim

other implied warranties that arise by course of dealing or usage of trade. The expectations of the buyer need as much protection in one case as in the other." *See* also: *Regan Purchase & Sales Corp.* v. *Primavera, supra.*

With the conspicious requirement of #2 deemed to be an implied modifier of allowable disclaiming language of #3, the "as is" clause should have been printed in larger type or contrasting color.

Whether the exclusionary language is "conspicuous" is a question of law for the court. *Hunt* v. *Perkins Machinery Co., supra.*

In further aid of our conclusion that the disclaiming language is insufficient as a matter of law are other factors peculiar to these Receipts. The documents are entitled "Started Pullet Delivery and Acceptance Receipt" typed in capital letters and so located on the documents as to convey the notion that these documents are nothing more than delivery receipts to be signed by Woodruff to show delivery. Nothing draws the buyer's attention to the exclusionary language. Woodruff also testified in his deposition that the terms of these "Delivery Receipts" were not drawn to his attention at the time of delivery and the first time the exclusionary language was drawn to his attention was after this litigation began.

Bringing the buyer's attention to exclusion of implied warranties is frequently emphasized by the cases in interpreting the UCC. *Mack Trucks of Ark., Inc.* v. *Jet Asphalt & Rock Co.,* (Ark. 1969), 437 S. W. 2d 459, is typical:

"The requirement that an exclusion or modification of implied warranties be conspicuous is to insure that attention of the buyer can reasonably be expected to be brought to it. Comment to UCC, Ark. Stat. Ann. § 85-1-201. Such an attempted disclaimer is ineffective, as a matter of law, and fails of its purpose when *it is in the body of an instrument and in type of the same size and color as other provisions.* Boeing Airplane Company v. O'Malley, 329 F. 2d 585 (5th Cir. 1964) ; SFC Acceptance Corp. v. Ferree, 39 Pa. Dist. & Co. R. 22d 225." (Emphasis supplied.) *See* also: *Minikes* v. *Admiral Corp* (1966), 48 Misc. 2d 1012, 266 N. Y. Supp. 2d

461; *Entron* v. *Central Cablevision of Palatka* (5th Cir. 1970), 435 F. 2d 995; *Massey-Ferguson, Inc.* v. *Utley* (Ky. 1969), 439 S. W. 2d 57; *Baker* v. *City of Seattle* (Wash. 1971), 484 P. 2d 405; *Zabriskie Chevrolet, Inc.* v. *Smith, supra; Farrar* v. *Kincheloe* (Ark. 1970), 460 S. W. 2d 800; *Gindy Mfg. Corp.* v. *Cardinale Trucking Corp., supra.*

The United States District Court for the Eastern District of Pennsylvania, in *Greenspun* v. *American Adhesives, Inc.* (D.C. E.D. Pa. 1970), 320 F. Supp. 442, even went so far as to say:

> "While there is some slight contrasting set-off, this is not sufficient. *A provision is not conspicuous when there is only a slight contrast* with the balance of the instrument. Sarnecki v. Al Johns Pontiac, 56 Luzerne Leg. Reg. R. 293 (1966)." (Emphasis supplied.)
> Thus, as was said in *Boeing Airplane Co.* v. *O'Malley, supra:*
> "An implied warranty under the statute must be disclaimed by the most precise terms; in other words, so clear, definite and specific as to leave no doubt as to the intent of the contracting parties."

Since the exclusionary language contained in the "Delivery Receipts" in the case before us was not drawn to the attention of Woodruff at the time of delivery, and since there was nothing contained within the body of the purported disclaimers drawing Woodruff's attention to the exclusionary language or making that language conspicuous in and of itself, these "Delivery Receipts" were insufficient as a matter of law to negate any implied warranties.

Having determined that the warranties of merchantability and fitness were implied as a matter of law and that the language and form of the Receipts were insufficient as a matter of law to operate as an effective disclaimer, a material question of fact was presented as to whether Farm Bureau violated these warranties.

ISSUE C.—It is our opinion that there was a material issue of fact presented as to the existence of express warranties, thereby rendering summary judgment improper.

Express warranties are governed by IC 1971, 26-1-2-313, Ind. Ann. Stat. § 19-2-313 (Burns 1964) (UCC 2-313) in the following manner:

(1) Express warranties by the seller are created as follows:
  (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
  (b) Any description of the goods which is made part of the basis of the bargain creates as express warranty that the goods shall conform to the description.
  (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of the express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

When an agreement of the parties is entirely in writing, a question of law is presented as to whether there is a breach of an express warranty. *Regina Grape Products Co.* v. *Supreme Wine Co.* (Mass. 1970), 216 N. E. 2d 219. The cases are legion holding that if the facts or affirmations relied upon to prove the existence of express warranties are wholly in parol, then it is the province of the jury to determine whether they amount to express warranties. To cite a few: *Naaf* v. *Griffitts* (1968), 201 Kans. 64, 439 P. 2d 83; *Babcock Poultry Farm, Inc.* v. *Shook* (1964), 204 Pa. Super. 141, 203 A. 2d 399; *Ruberoid Co., Inc.* v. *Briscoe* (5th Cir. 1961), 293 F. 2d 712; *Chapman* v. *Brown* (D.C. Hawaii 1961), 198 F. Supp. 78; *Pedroli* v. *Russel* (1958), 157 Cal. App. 281, 320 P. 2d 873; *Kaufman* v. *Katz* (1959), 356 Mich. 354, 97 N. W. 2d 56; *Ladewig* v. *Glencoe Mills* (1962), 261 Minn.

501, 113 N. W. 2d 80; *Eastman Kodak* v. *Summus* (Mo. App. 1964), 377 S. W. 2d 476; *Brown* v. *Globe Laboratories* (1957), 165 Neb. 138, 84 N. W. 2d 151; *Funk* v. *Kaiser-Frazer Sales* (1965), 23 A. D. 2d 771, 258 N. Y. Supp. 2d 553; *Compton* v. *M. O'Neil Co.* (1955), 101 Ohio App. 378, 139 N. W. 2d 635; *Farmers Coop. Elevator* v. *Anderson* (Okla. 1959), 335 P. 2d 915; *Spartanburg Hotel Corp.* v. *Alexander Smith, Inc.* (1957), 231S. C. 1, 97 S. E. 2d 199; *Davis Motors* v. *Avett* (Tex. Civ. App. 1956), 294 S. W. 2d 882.

The repeated statements made by Farm Bureau representatives to Woodruff, such as, "the chickens would bloom out" and that he "would only get the good ones," were oral assertions. Whether such assertions constituted express warranties and whether Woodruff relied upon these assertions are material issues of fact to be determined by the trier of fact. Consequently, it was reversible error for the trial court to determine as a matter of law that these assertions did not constitute express warranties when in fact the jury should have been the sole judge as to whether express warranties were created.

ISSUE D.—If the assertions made by Farm Bureau constituted express warranties, it is our opinion that the disclaiming language of the Receipts was unreasonable as a matter of law and therefore insufficient to negate any express warranties.

IC 1971, 26-1-2-316(1), Ind. Ann. Stat. § 19-2-316(1) provides for the exclusion or modification of express warranties:

"19-2-316. EXCLUSION OR MODIFICATION OF WARRANTIES.—

(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article [chapter] on parol or extrinsic evidence (section [19-]2-202) *negation or limitation is inoperative to the extent that such construction is unreasonable.*" (Emphasis supplied.)

This statute creates a test of reasonableness to be applied where there is an attempt to both warrant and to refuse to warrant at the same time. The seller runs both with the hares and the hounds and in the course of doing so creates an ambiguity. If an expressed warranty and a disclaimer of an expressed warranty exist in the same sale, an irreconcilable conflict emerges. The statute solves the problem by emphasizing that any negation or limitation of an expressed warranty is inoperative if it is "unreasonable." The interpretation of the statute therefore must be that if it is unreasonable or impossible to construe the language of the expressed warranty and the language of the disclaimer as consistent, the disclaimer becomes inoperative.

In the past this seems to be the direction taken by courts construing this section of the UCC, as they have evidenced a distinct distaste for disclaimers by construing them strictly against the seller. *Berk* v. *Gordon Johnson Co.* (D.C. E.D. Mich. 1964), 232 F. Supp. 682; *Beech Aircraft* v. *Flexible Tubing Corp.* (D.C. Conn. 1967), 270 F. Supp. 548; *Admiral Oasis Hotel Corp.* v. *Home Gas Industries, Inc.* (1966), 68 Ill. App. 2d 297, 216 N. E. 2d 282. In *Wilson Trading Corp.* v. *David Ferguson Ltd.* (1968), 23 N. Y. 2d 398, 244 N. E. 2d 685, the Court of Appeals of New York considered an attempt by a seller to create express warranties on the one hand and disclaimers of those warranties on the other. In keeping with judicial aversion to negation of express warranties and the statute's stated intention that disclaimers are inoperative if they are not reasonably reconcilable with language of express warranty, the court said:

> "An attempt to both warrant and refuse to warrant goods creates an ambiguity which can only be resolved by making one term yield to the other (cf. Hawkland, Limitation of Warranty Under the Uniform Commercial Code, 11 How. L. J. 28 [1965]). Section 2-316 (subd. [1]) of the Uniform Commercial Code provides that *warranty language prevails over the disclaimer if the two cannot be reasonably reconciled.*

"Here, the contract expressly creates an unlimited express warranty of merchantability while in a separate clause purports to indirectly modify the warranty without expressly mentioning the word merchantability. Under these circumstances, the language creating the unlimited express warranty must prevail over the time limitation insofar as the latter modifies the warranty." (Emphasis supplied.) *See* also: *Berk* v. *Gordon Johnson Co., supra; Valmont-Pacific* v. *Kelley* (1971), 94 Idaho 373, 487 P. 2d 1127; *Associated Seed Growers* v. *Johnson* (Ark. 1957), 297 S. W. 2d 934.

If the trier of fact finds that the representations made by Farm Bureau to Woodruff were in fact express warranties, then any subsequent attempt by Farm Bureau to disclaim those warranties is unreasonable to the extent that the effect of the disclaimer is subject to more than one interpretation.

By this somewhat tortuous route we must necessarily finally conclude that material issues of fact arose as to the violation of implied warranties of merchantability and fitness and as to the existence and violation of express warranties, none of which are negated by the disclaiming language of the Receipts. Therefore it was reversible error to sustain the motion for summary judgment.

A further word. By way of Amended Complaint and his Motion to Correct Errors, Woodruff raised the question as to whether Farm Bureau engaged in any fraud or misrepresentation to obtain Woodruff's signature on the purported disclaimers. In view of our decision that these Delivery Receipts were insufficient as a matter of law to disclaim any warranties, express or implied, there is no need to consider the question of whether Woodruff was fraudulently induced to sign the Receipts.

The summary judgment of the trial court is therefore reversed and remanded for further proceedings not inconsistent with this opinion.

White and Sullivan, JJ., concur.

Note.—Reported in 286 N. E. 2d 188.