**JAMESON CHEMICAL COMPANY, LTD., Plaintiff-Appellant,**

v.

**Jack LOVE d/b/a Eaton Grinding, Defendant-Appellee.**

**No. 1–1079A273.**

Court of Appeals of Indiana, First District.

March 3, 1980.

---

Wendell B. Iddings, Iddings & Whitsitt, Lebanon, for plaintiff-appellant.

Hollis Roy Martin, Martin & Wharry, Lebanon, for defendant-appellee.

RATLIFF, Judge.

## STATEMENT OF THE CASE

Plaintiff-appellant Jameson Chemical Company, Ltd. appeals from the judgment of the Boone Circuit Court in favor of defendant-appellee Jack Love on his counterclaim.

Affirmed in part and reversed in part.

## STATEMENT OF THE FACTS

Jack Love is a contractor in the insulation and roofing business in Lebanon, Indiana. Jameson Chemical Company, Ltd. is a Michigan corporation which distributes various foam and coating products from its warehouse in Berrien Springs, Michigan.

In the fall of 1975, Love ordered from Jameson urethane foam products manufactured by the CPR Division of the Upjohn Company and a coating product, Diathon, manufactured by United Coatings. Love used these products to coat the roofs of certain factory buildings in Ohio. Love had previously spoken with Neil Berger, a manufacturer's representative for United Coatings, at the job sites, and Berger had indicated that he thought the Diathon would be appropriate in those situations. Berger advised Love to buy the products from Jameson. However, there is no evidence that James Betchek, president of Jameson, or any other representative or agent of Jameson knew, at the time the goods were ordered, of the specific use to which Love intended to put the Diathon.

Within a year the roof coating applied by Love began to deteriorate, requiring him to replace the materials at his own expense. Love had not paid for the goods supplied by Jameson.

Jameson brought suit on account in the Boone Circuit Court. Love counterclaimed, alleging that the goods purchased from Jameson were of inferior quality. After a trial to the court, judgment was entered in favor of Jameson in the amount of $3,926.46 on its complaint and in favor of Love in the amount of $3,558.00 in damages plus $800.00 in attorney's fees on his counterclaim. It is from the judgment for Love on his counterclaim that Jameson brings this appeal.

## ISSUES

1. Whether an award of damages under the warranty sections of the Uniform Commercial Code authorized the Court to award attorney's fees, where no request for such fees appeared in the defendant's pleadings nor was any evidence introduced to support such an award.

2. Whether the evidence supported the finding of an implied warranty of fitness of purposes where the plaintiff conceded a warranty of merchantability.

3. Whether defendant followed the written instructions furnished with the product purchase from the plaintiff in the use of the product which would entitle him to an implied warranty of fitness of purpose.

4. Whether the printed disclaimers of all express and implied warranties on the written material (Defendant's Exhibits No. 37 and 38) were sufficient to bring plaintiff within the exceptions of IC 1971, 26–1–2–316(3)(a) (Burns Code Ed.).

5. Whether the statements of the manufacturer's agent, Neil Berger, made to defendant were sufficient to establish an implied warranty of fitness of purpose.

## DISCUSSION

*Choice of Law*

We must deal with the threshold problem of determining which state's law governs the issues in this case. The trial court stated in its "Findings of Fact and Conclusions of Law":

"That either the Laws of the State of Michigan or the State of Ohio will govern this cause of action and either one is available and has the same consequences for the reason being that both states have adopted the Uniform Commercial Code as will be applicable to this cause of action.

That the UCC Code Sec. 2–314, 2–316, and 2–714 will apply as set forth in West Uniform Laws, Annotated, Uniform Commercial Code, Master Addition [sic], 1976, and Supplements thereto."

Jameson asserts that in regard to the parties' contentions concerning § 2–316 of the Uniform Commercial Code (hereinafter cited as UCC), the law of Indiana is applicable because it is the same as the laws of Michigan and Ohio. Love argues that the laws of Ohio or Michigan must be applied to this case.

■ Ordinarily, on a choice of law question involving the UCC, we would look to IC 1971, 26–1–1–105 (Burns Code Ed.), which provides in relevant part:

"26–1–1–105. . . . TERRITORIAL APPLICATION OF THE ACT; PARTIES' POWER TO CHOOSE APPLICABLE LAW. (1) Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement this act [26–1–1–101—26–1–10–106] applies to transactions bearing an appropriate relation to this state."

■ However, before a trial court can determine whether the law of another state applies in a situation such as this where the parties have not agreed on that matter, a party must either offer evidence of the law of the other state or ask the trial court to take judicial notice of that law pursuant to the Uniform Judicial Notice of Foreign Law Act[1] (hereinafter cited as UJNFLA) and Ind.Rules of Procedure, Trial Rule 44.-1(B). Furthermore, before either of those

alternatives may be exercised, "reasonable notice must be given to the adverse parties either in the pleadings or otherwise." IC 1971, 34–3–2–4 (Burns Code Ed.).

We can find no indication in the record presented to us that either party gave reasonable notice of intent to prove the law of another state or to ask the court to take judicial notice of that law. No attempt was made at trial to offer evidence of the law of another state, nor was the trial court requested to take judicial notice of such other law. None of the pleadings or pretrial motions cites the law of another state. It was not until 15 days after the trial when the parties submitted their proposed "Findings of Fact and Conclusions of Law" that any reference was made to the laws of Michigan or Ohio. Furthermore, all case law cited in the appellate briefs is from Indiana courts, and all citations to the UCC come from either the Indiana Code or West's Uniform Laws, Annotated.

In *Igleheart Bros. v. John Deere Plow Co.* (1943) 114 Ind.App. 182, 51 N.E.2d 498, a creditor brought an action for conversion against the vendee of certain crops, on which the debtor-vendor had executed to the creditor a chattel mortgage. The Appellate Court noted that the conditional sale contracts entered into by the creditor and debtor gave the creditor certain rights under the law of Illinois, and that it appeared that the parties intended that the laws of Illinois should govern the contracts. Nonetheless, with regard to the UJNFLA, the Appellate Court held as follows:

"The law of Illinois was neither pleaded nor proven, nor were any steps taken to require the court to take judicial notice of the law of that state in accordance with the provisions of Burns' 1933, § 2–4801, et seq., and it will therefore be presumed that the common law, as interpreted and applied in this state, prevails there. * * * "

114 Ind.App. at 185, 51 N.E.2d at 499.

■ Similarly, we hold that because the provisions of the UJNFLA were not

1. IC 1971, 34–3–2–1 through 34–3–2–7 (Burns Code Ed.).

followed here, we will apply the laws of Indiana and of the United States to the case at bar. Therefore, we need not decide which state's law would otherwise apply under IC 26–1–1–105. It is incumbent upon litigants to properly and timely raise a choice of law question in the trial court.

*Issue One*

The trial court awarded Love attorney's fees in the amount of $800.00 on his counterclaim, relying on the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, 15 U.S.C.A. §§ 2301 through 2312 (Supp.1979). Jameson complains that the attorney's fees were awarded without demand in the counterclaim or proof at trial.

The relevant statutory provision, 15 U.S.C.A. § 2310(d) (Supp.1979), reads as follows:

"(d)(1) Subject to subsections (a)(3) and (e) of this section, a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief—

(A) in any court of competent jurisdiction in any State or the District of Columbia; or

(B) in an appropriate district court of the United States, subject to paragraph (3) of this subsection.

(2) If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses *(including attorneys' fees based on actual time expended)* determined by the court to have been reasonably incurred by the plaintiff for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate." (Our emphasis.)

It has been said that "a judge has the power to make an award of attorneys fees (where proper) without any evidence whatsoever by merely relying upon his own knowledge of what a reasonable attorney's fee should be," *In re Lockyear* (1974) 261 Ind. 448, 459, 305 N.E.2d 440, 446, and that "[i]f no evidence is offered in proceedings in which it is proper for the trial court to award reasonable attorneys fees, he may do so, and his decision is reviewable only for abuse of discretion," *Fox v. Galvin* (1978) Ind.App., 381 N.E.2d 103, 108.

■ However, in the case at bar the statute authorizing an award of attorney's fees, 15 U.S.C.A. § 2310(d)(2), expressly limits attorney's fees to those "based on actual time expended." In the absence of evidence of the amount of time spent on the case by counsel for Love, the trial court was without authority to award attorney's fees. The court's award of attorney's fees constitutes reversible error.

*Issue Two*

Jameson characterizes this issue as "[w]hether the evidence supported the finding of an implied warranty of fitness of purpose where the plaintiff conceded a warranty of merchantability." Jameson contends that the trial court said in its findings that the Diathon supplied by Jameson was of inferior quality and that Jameson had impliedly warranted it to be an inferior product. Jameson maintains that what the court meant to say was that Jameson had impliedly warranted the product to be fit for the purpose of its intended use.

The finding to which Jameson refers reads as follows:

"That the Court finds that with the warranty of merchantability and also an implied warranty that the plaintiff has supplied an inferior product."

■■ With regard to this issue as it was framed by Jameson, we would say that at the outset that we find no mutual incompatibility between implied warranties of merchantability and fitness for a particular purpose. It is quite possible for both warranties to exist in a particular transaction.

The implied warranty of merchantability deals *inter alia* with the fitness of goods "for the *ordinary* purposes for which such goods are used." (Our emphasis.) IC 1971, 26–1–2–314(2)(c) (Burns Code Ed.). On the other hand, the implied warranty of fitness for a particular purpose applies to a situation "[w]here the seller at the time of contracting has reason to know any *particular* purpose for which the goods are required and that the buyer is relying upon the seller's skill or judgment to select or furnish suitable goods, . . . ." (Our emphasis.) IC 1971, 26–1–2–315 (Burns Code Ed.).

We disagree with Jameson's assertion that the trial court found that an implied warranty of fitness for a particular purpose exists. The court expressly found "that defendant at no time informed plaintiff of the intended use of said [foam and coating] products." (Our insertion.) The trial court did find that Berger inspected the roofs, suggested to Love that products of which Jameson was distributor might solve the problem, and advised Love to contact Jameson to purchase the products. However, the court also described Berger as a "manufacturer's representative" and not as Jameson's representative. In its "Conclusions of Law," the trial court quoted authorities which referred to both the implied warranty of merchantability and the implied warranty of fitness for a particular purpose. However, these quotations appear to have been included for illustrative purposes only. The court's emphasis in its discussion of this case in the "Conclusions of Law" was clearly upon the implied warranty of merchantability.

■ Indeed, had the trial court intended to say that there was an implied warranty of fitness for a particular purpose in addition to an implied warranty of merchantability, it would have been in error. The evidence indicates, as the trial court pointed out, that Love did not inform Jameson of the purpose for which the Diathon was intended to be used. There was no substantial, probative evidence that Berger was an agent of Jameson's such that his knowledge of Love's intended purpose could be imputed to Jameson.

Jameson complains that the trial court relied heavily upon a statement in Defendant's Exhibit No. 39 pertaining to the market testing of a written warranty which could be obtained on the Diathon. He argues that the written warranty was unavailable to Love and should not have been considered by the court. The statement quoted by the trial court reads as follows:

"In market testing this type of Warranty, we have found it to have good psychological impact on building owners. There is more confidence generated to the building owner because of the *existance* [sic] of a formal Warranty against leakage. As a result, jobs are sold more easily, and in many instances the Warranty is not even requested. With or without the Warranty, United's DIATHON, ELASTRON or ELASTUFF coatings are engineered to adequately coat and protect urethane foam roofing." (Original emphasis.)

The testimony clearly indicates that the written, express warranty referred to above was not applicable to Love's purchases of Diathon from Jameson because the quantity purchased was too small. Moreover, the copy of the warranty agreement included in Defendant's Exhibit No. 39 is unexecuted. Thus, at best this exhibit was evidence of "the ordinary purposes for which such goods are used." IC 26–1–2–314(2)(c). The trial court did not expressly state that it found an express warranty applicable to this action, and we, therefore, will not assume that an express warranty underlies the judgment. Consequently, we are not troubled by Defendant's Exhibit No. 39.

*Issue Three*

Jameson argues, in essence, that the evidence shows that Love failed to apply the Diathon in accordance with instructions with which he was furnished. Consequently, Jameson contends that even if the Diathon were warranted to be fit for the particular purpose for which Love purchased it, Love is responsible for the failure of the Diathon to work properly.

We have already held that no implied warranty of fitness for a particular purpose was involved here. As far as the implied warranty of merchantability is concerned, we find that there is conflicting evidence with regard to Love's compliance with the application instructions. We must "not set aside the findings or judgment unless clearly erroneous, . . . ." Ind. Rules of Procedure, Trial Rule 52(A). We cannot say that the trial court clearly erred in not finding that Love's method of application was the proximate cause of the failure of the Diathon to work properly.

*Issue Four*

Jameson asserts that Defendant's Exhibits Nos. 37 and 38 contained statements which acted as disclaimers of any implied warranties.

Defendant's Exhibit No. 37 consists of technical information and recommended application procedures for Upjohn Company's CPR Rigid Urethane. The trial court did not find the urethane to be of inferior quality, only the Diathon. Consequently, the disclaimers in this exhibit are immaterial to the judgment in the case at bar.

Defendant's Exhibit No. 38 consists of technical data, specifications, and application instructions for United Coatings' Diathon. At the foot of the second, seventh, and eighth pages of this fifteen pages exhibit is printed the following statement:

"NOTE: Our data and suggestions are based on information from laboratory and field testing which we believe to be reliable. Because methods of application and conditions vary with each situation, we cannot guarantee or accept any liability resulting from the use of our products."

The acceptable methods of excluding warranties pertaining to goods are laid out in IC 1971, 26–1–2–316 (Burns Code Ed.), which provides in relevant part as follows:

"(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'

(3) Notwithstanding subsection (2)

(a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; . . . ."

The term "conspicuous" is defined in IC 1971, 26–1–1–201(10) (Burns Code Ed.) as follows:

"(10) 'Conspicuous': A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON–NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color. But in a telegram any stated term is 'conspicuous.' Whether a term or clause is 'conspicuous' or not is for decision by the court."

The purported disclaimers in Defendant's Exhibit No. 38 do not mention merchantability. Although there was no "as is" or "with all faults" language in the disclaimers, they did say, "We cannot guarantee or accept any liability resulting from the use of our products." However, the type size used is smaller than that in the main body of the exhibit. The disclaimers are not highlighted except for the introductory word "NOTE."

"Disclaimers of implied warranties under [IC 1971, 26–1–2–316], . . . are not favored and are strictly construed against the sellers for reasons of public policy. . . ." (Citations omitted.) *Woodruff v. Clark County Farm Bureau Cooperative Ass'n.* (1972) 153 Ind.App. 31, 45, 286 N.E.2d

188, 196. The trial court concluded that "there was no evidence introduced at this cause that plaintiff relied on any disclaimers of any warranties as to product to the buyer either verbally or written." The trial court's determination that the purported disclaimers were ineffective to exclude the implied warranty of merchantability was not clearly erroneous.

*Issue Five*

Jameson argues here that the trial court improperly relied upon Berger's statements regarding the suitability of the Diathon for the jobs in Ohio. It contends that Berger's statements were merely opinions and that under IC 1971, 26–1–2–313(2) (Burns Code Ed.)[2] they should not have been found to give rise to an implied warranty.

Jameson has apparently misunderstood the scope of IC 26–1–2–313. That section deals with *express* warranties. As Judge Buchanan said in *Woodruff, supra,*

> "These implied warranties of merchantability and fitness for a particular purpose do not arise out of an agreement between the parties; they may even exist when no specific promise has been made by the seller to the buyer. . . . Thus, they are imposed *by operation of law* for the protection of the buyer, and they must be liberally construed in favor of the buyer. . . ." (Citations omitted; original emphasis.)

153 Ind.App. at 42–43, 286 N.E.2d at 194–95. The trial court did not specifically find that Berger's statements created an express warranty, and we need not decide that question here.

### CONCLUSION

■ Jameson has not challenged the trial court's conclusion that an implied warranty of merchantability applies to the transactions in question except to the extent that Jameson has unsuccessfully contended, *supra,* that the disclaimers effectively exclude all warranties. However, we observe that there was substantial, probative evidence from which the trial court could conclude that an implied warranty of merchantability existed with regard to the Diathon and that Jameson breached that warranty.

Consequently, the only reversible error in this case concerns the awarding of attorney's fees to Love without the introduction of evidence of "actual time expended," as required by 15 U.S.C.A. § 2310(d)(2). Accordingly, we affirm the judgment of the trial court with regard to the damages awarded for breach of warranty, and we reverse and remand for further proceedings consistent with this opinion with regard to the award of attorney's fees.

ROBERTSON, P. J., and NEAL, J., concur.

---

**2.** "(2) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warran- ty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty . . .."